IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN THE MATTER OF THE COMPLAINT OF J.A.R. BARGE LINES, L.P., AS OWNER, AND MON RIVER TOWING, INC., AS OWNER *PRO HAC VICE*, OF THE M/V *ROSE G.*, FOR EXONERATION FROM AND/OR LIMITATION OF LIABILITY | ) ) ) ) ) ) ) | Civil Action No. 03-163   as consolidated with |
| COMPLAINT OF INGRAM BARGE COMPANY (AS TRANSFEREE) FROM MIDLAND ENTERPRISES LLC, AS OWNER OF BARGE NO. OR 4833 FOR EXONERATION FROM AND/OR LIMITATION OF LIABILITY | ) ) ) ) ) ) | Civil Action No. 03-180 |
| MARK ALLEN SMITH, Plaintiff, vs. M/V *BILL DYER*, TRI-RIVER FLEETING & HARBOR SERVICE, AND TRI-RIVER MARINE, INC. Defendants | ) ) ) ) ) ) ) ) ) ) ) | Civil Action No. 04-753 |
| and COMPLAINT OF TRI-RIVER MARINE, INC., AND TRI-RIVER FLEETING & HARBOR SERVICE FOR EXONERATION FROM AND/OR LIMITATION OF LIABILITY | ) ) ) ) ) ) | Civil Action No. 04-1611 |

**MEMORANDUM OPINION**

As ordered by the Court, Special Master Mark D. Shepard, Esq., filed a Report and Recommended Findings of Fact and Conclusions of Law Regarding Liability, Causation and Exoneration/Limitation of Liability (CA No. 03-163, Doc. No. 202,[1] "R&R") in the four cases

---

[1] Unless otherwise noted, references to docket entries are those in the lead case, CA No. 03-163.

captioned above.  Subsequently, Mark Allen Smith and Mon River Towing, Inc.[2] ("Smith" and "Mon River," respectively), and Ingram Barge Company ("Ingram") filed objections to those recommendations.  The remaining parties involved in these actions, Tri-River Marine, Inc., Tri-River Fleeting & Harbor Service, Inc., and the M/V *Bill Dyer* (collectively, "Tri-River") did not file objections.  For the reasons discussed below, the objections by Smith and Mon River are overruled and the objections by Ingram are sustained.

I.      **BACKGROUND**

        A.      <u>Factual History</u>[3]

                On January 21, 2003, Mark Allen Smith was employed as a lead deckhand for Mon River, assigned to its harbor boat, the M/V *Rose G.*  The captain of the *Rose G.* at that time was Leonard Kurowsky ("Kurowsky") and other deckhands included Shawn Becker ("Becker") and Michael Petrola ("Petrola"), all of whom were Mon River employees.  Smith was an experienced deckhand who had worked intermittently for Mon River since 1997.  He and the other crew members had been trained by their employer in performing their duties and in safety procedures according to the company's manuals and rules.

        That evening, the *Rose G.* and its crew were performing fleeting and harbor duties for Ingram at its Dravosburg, Pennsylvania, facility at approximately Milepost 17 of the Monongahela River ("Dravosburg Landing"), where Ingram barges were cleaned and repaired.  One of the *Rose G.*'s duties was to move empty coal barges from one part of the facility to another.  Pursuant to a letter agreement between Mon River and Ingram dated January 16, 2003, as well as the customary

---

        [2]  The caption of CA No. 03-163 describes "J.A.R. Barge Lines, L.P. as Owner" and "Mon River Towing, Inc., as Owner *Pro Hac Vice* of the M/V *Rose G.*" However, the parties and the Special Master refer to those entities collectively as Mon River Towing in discussing these cases.  The Court adopts the same terminology for ease of reference.

        [3]  This section is based primarily on the Special Master's Findings of Fact in the R&R. Additional facts are discussed below in the context of Smith and Mon River's objections.

practice of the parties, Ingram provided Kurowsky with a daily list of barges to move into certain positions in the fleet while Kurowsky and his crew were entirely in control of the operations involved in transferring the barges, e.g., how to position the *Rose G.*, move the individual barges, and move fleets of barges.  One of the procedures involved a maneuver referred to as "rounding-to," in which a barge is disconnected from the fleet, moved into the open part of the river, turned 180 degrees so that the end formerly pointing downriver faces upriver, and re-connected to the rest of the fleet. Smith, Kurowsky, and the other members of the *Rose G.* crew were all familiar with this procedure.

At about 9:30 p.m., Smith and Becker were working on a string of four barges, getting ready to move Ingram's Barge OR 4833 from the upriver end of a barge fleet moored at the Dravosburg Landing into position under (i.e., below) Barge T-13613 at the downriver end of the fleet.  The areas on the barges where they were working were illuminated by spotlights and worklights on the *Rose G.* and each of the men had a flashlight.  As the *Rose G.* began to move Barge 4833 downriver so it could begin the rounding-to procedure, Smith, who was standing with Becker at the front of the barge, noticed a towboat headed upriver, subsequently identified as the M/V *Bill Dyer* and owned by Tri-River Marine, Inc.  Smith radioed Kurowsky about the *Bill Dyer*; Kurowsky in turn radioed that vessel advising it to pass at its discretion.  Kurowsky then radioed Smith and instructed him to "catch a line" from Barge 4833 to Barge 13613 which was already in the moored fleet.  Smith crossed the deck of Barge 4833 to the forward starboard corner to retrieve a line he had left there earlier.  Meanwhile, Kurowsky moved Barge 4833 close enough for Becker to cross over to Barge 13613 and then to Barge 1416 so he could remove a line which would interfere with placing Barge 4833 into position.  Smith put the eye of the line around a timberhead on the forward port corner of Barge 4833, then tossed a loop of line around a timberhead on Barge 13613, and radioed Kurowsky that he had "caught a line."

As the *Rose G.* began to swing Barge 4833 into position under Barge 13613, Smith realized his right foot was inside the coil of line still lying on the deck of Barge 4833.  Before he could

remove his foot from the coil or the eye of the line from around the timberhead, the line tightened around his leg.  As the *Rose G.* moved backward some 10 to 15 feet, Smith was pulled into the river and up onto the freezing deck of Barge 13613.  Becker saw what was happening and ran across the decks to Barge 13613 where he began to administer first aid to Smith's severely broken lower right leg.  Becker also radioed Kurowsky that there was a man overboard; Kurowsky immediately took steps to stop any movement of the *Rose G.* and sounded the general alarm.

While waiting for emergency paramedics, Smith told Becker there were empty beer cans in his bunkroom on the *Rose G.*, a violation of Mon River's zero-tolerance policy regarding drug and alcohol use on-board.  Smith asked Becker to get rid of the cans and Becker passed the request along to Petrola who threw two empty cans into the river.  Smith was taken by helicopter to Presbyterian Hospital in Pittsburgh, Pennsylvania, where his right leg was later amputated just below the knee.  While in the hospital, Smith told Pamela and Eugene Miklaucic, drug and alcohol testing program administrators hired by Mon River, that he "should not have done what [he] did," that he "stepped on the wrong spot on the barge," and that the accident was his fault.  Two days later, he told Mon River's Port Captain, Tim Watts ("Watts"), essentially the same thing.

B.   Procedural History

Shortly after the accident, Smith filed a claim against Mon River for maintenance and cure.  Both Mon River and Ingram soon filed actions for limitation of liability and/or exoneration, pursuant to 46 U.S.C. § 185.  (*See*, respectively, In re J.A.R. Barge Lines, CA No. 03-163, and Complaint of Ingram Barge Co. *et al.*, CA No. 03-180.)  Smith filed as a claimant in those cases, asserting that he was a "Jones Act seaman" with regard to both the *Rose G.* and Barge 4833.  Ingram filed as a claimant in Mon River's limitation action, contending that it was entitled to indemnification for any liability to Smith because Mon River had breached an implied duty of workmanlike performance.  (Doc. No. 11.)  Mon River in turn filed as a claimant in the Ingram case, demanding indemnification and reimbursement for maintenance and cure paid to Smith.  (CA No.

4

03-180, Doc. No. 14, ¶ 6.)

Following a hearing on April 2, 2004, Smith and Mon River entered into a specific release and settlement agreement pursuant to Local Rule 17.2 in which Smith agreed to dismiss all claims against his employer in exchange for a cash settlement over and above his maintenance and cure. (Doc. No. 27.)  The settlement agreement, however, also contained a clause which required Smith to defend and indemnify Mon River against the claims of Ingram and in any other litigation which might arise out of the accident.[4]  Although Mon River attempted to be dismissed from the related cases, the Court declined to allow it to do so in light of Smith's pending claims against Ingram and Ingram's claim for indemnity against Mon River in the latter's suit for limitation of liability.  (*See* hearing transcript, Doc. No. 32.)

Some sixteen months after the accident, on May 19, 2004, Smith filed suit against the Tri-River parties,[5] claiming that the *Bill Dyer* had been negligent and/or unseaworthy in that when the accident occurred, it was navigating without lights and had passed at an unsafe distance from the *Rose G.* without proper warning.  The hydraulic displacement[6] caused by this unsafe passage pulled the *Rose G.* and the barge downriver, thereby contributing to his injury.  Among other claims, Smith alleged that the *Bill Dyer* failed to send radio signals as required by the rules of inland

---

[4]  At the hearing, Smith was explicitly examined by counsel for Mon River on his understanding of the clause in question, Paragraph 11, and stated that he understood its implications.  (*See* hearing transcript, Doc. No. 32, at 24-25.)

[5]  Tri-River Fleeting & Harbor Service crews and operates motor vessels chartered from Tri-River Marine, including the *Bill Dyer*.  (Finding of Fact 4.)

[6]  The Court has been unable to pinpoint a formal definition of the term "hydraulic displacement" and, indeed, the litigants use the term interchangeably with "wheel wash" and "surge."  (Tr. 180, 295-297, 614, 782; *see*, however, testimony at Tr. 1503-1504 by Ingram/Tri-River expert Earl Darst that wheel wash comes from the stern of the vessel and is different from hydraulic displacement.) The working definition the Court has used herein is the displacement caused as a propeller-driven vessel (like a towboat) moves through the water, first pushing water away from itself, then drawing it back in under the boat.  A movable object near the passing vessel is consequently first pushed away from the vessel, then pulled back toward it.  Hydraulic displacement is not the same as the wake created by a moving vessel.  (Tr. 296, 614.)

navigation,[7] the crew was untrained, and the boat failed to keep a proper lookout.  (*See* Smith v. M/V *Bill Dyer et al.*, CA No. 04-753.)  Tri-River consequently filed its own complaint for exoneration or limitation of liability on October 21, 2004.[8]  (*See* Complaint of Tri-River Marine, Inc., *et al.*, CA No. 04-1611.)  Smith filed as a claimant in the Tri-River limitation action, setting out essentially the same allegations as in his suit against those parties.  Ingram also filed as a claimant in the Tri-River action, asserting a claim for contribution and/or indemnity.  (CA No. 04-1611, Doc. No. 7.)  Tri-River responded by filing as a claimant in the Ingram action, asserting similar claims.  (CA No. 03-180, Doc. No. 33.)

A case management order signed by Judge William L. Standish on November 18, 2004, consolidated the four cases for purposes of discovery.  While discovery was proceeding, oversight of these cases (along with some 89 others) was temporarily assigned by Chief Judge Donetta W. Ambrose to the undersigned due to Judge Standish's ill health.  A joint status conference was held on March 1, 2006, at which the parties were unable to arrive at settlement terms.  They did agree, however, to proceed before a Special Master pursuant to Federal Rule of Civil Procedure 53(A) for the purpose of hearing arguments and evidence of the parties.[9]  An Order of Court appointing Mark D. Shepard, Esq., as Special Master was entered on March 2, 2006 (Doc. No. 112), and the cases consolidated for all purposes on March 30, 2006 (Doc. No. 230.)  The consolidated cases were permanently assigned to the undersigned by Order of Chief Judge Ambrose on February 28, 2007.

---

[7] *See* Inland Navigational Rules, 33 U.S.C. §§ 2001-2038 and the annex thereto, 33 C.F.R. §§ 84-88.

[8] Tri-River attempted to be added as a claimant in CA No. 03-163 on October 18, 2004, after Smith filed suit against them, seeking contribution and/or indemnification from Mon River if Tri-River should be found liable to Smith as a result of the unseaworthiness or negligence of the *Bill Dyer*.  (Doc. No. 39.)  This motion was denied, however, on February 17, 2005, because the Court concluded that Tri-River's claims for contribution – based solely on tort law – were precluded by McDermott, Inc. v. AmClyde, 511 U.S. 202 (1994), and Boca Grande Club, Inc. v. Florida Power & Light Co., 511 U.S. 222 (1994).  (*See* Memorandum Opinion, Doc. No. 51.)

[9] This consent is now being challenged by Smith and Mon River as discussed in Section III.B.

(Doc. No. 253.)

From July 17 to July 21, 2006, Special Master Shepard conducted an evidentiary hearing on the questions of liability, causation, and exoneration.  The parties also submitted pre- and post-hearing memoranda of law and proposed findings of fact.  On September 20, 2006, the Special Master issued his Report and Recommended Findings of Fact and Conclusions of Law discussed in more detail below.  Pursuant to an Order of Court, each party was directed to file its objections, if any, to the Special Master's R&R, and their responses, if any to those objections.  (Doc. No. 203.) The parties having complied with those directives, the matter is now ripe for review by the Court.

C.    Jurisdiction and Venue

Article III § 2 of the United States Constitution vests federal courts with jurisdiction over cases based in admiralty and maritime law.  Lewis v. Lewis and Clark Marine, Inc., 531 U.S. 438, 443 (2001); see also 28 U.S.C. § 1333.  This Court has jurisdiction over the three complaints for exoneration from and/or limitation of liability pursuant to its admiralty and maritime jurisdiction and Federal Rule of Civil Procedure 9(h) as well as the Vessel Owners Limitation of Liability Act, 46 U.S.C. § 30511 (formerly 46 U.S.C. § 185 ), and Rule F of the Federal Rules of Civil Procedure Supplemental Rules for Certain Admiralty and Maritime Claims ("Admiralty Rules.")

Smith contends that the Court has jurisdiction over his suit against Tri-River pursuant to 46 U.S.C. § 688,[10] "the Jones Act," 28 U.S.C. § 1332, and/or 28 U.S.C. § 1333.  (See CA No. 04-753, Complaint, ¶ 5.)  The Court disagrees that jurisdiction is provided by 28 U.S.C. § 1332 inasmuch as there is no diversity between Smith and the Tri-River parties, all of which are citizens of Pennsylvania.  28 U.S.C. § 1332(a)(1) and (c)(1).  Therefore, the Court concludes Smith's claims are cognizable only as admiralty or maritime claims.  Fed. R. Civ. P. 9(h).

_____

[10]  The Jones Act is now codified at 46 U.S.C. § 30101 et seq.  After Smith filed his lawsuit against Tri-River and claims in the three limitation of liability suits, the section to which Smith cites, 46 U.S.C. § 688, was repealed by Pub. L. No. 109-304, 120 Stat. 1485, on October 6, 2006, and replaced by 46 U.S.C. § 30104(a).

Venue is proper in this District pursuant to Admiralty Rule F(9) inasmuch as this is the district in which the parties seeking to limit liability chose to file their actions.  Smith's suit against Tri-River is properly brought here inasmuch as the underlying events took place in the Western District of Pennsylvania.

## II.     STANDARD OF REVIEW

Federal Rule of Civil Procedure 53 provides the standard for this Court to apply in its review of the Special Master's Report and Recommendations.  Under that Rule, the Court reviews *de novo* the Special Master's findings of fact unless the parties have stipulated to another standard, an exception not applicable here.  Fed.R.Civ.P. 53(g)(3).  Conclusions of law recommended by the Master are also subject to *de novo* review.  Id., Rule 53(g)(4).  This Court must afford the parties an opportunity to be heard and may adopt or affirm, modify, wholly or partly reject or reverse, or resubmit the matter to the Special Master with instructions.  Id., Rule 53(g)(1).

## III.    PRELIMINARY ISSUES

As a preliminary matter, the Court considers Smith's claims that (1) he is entitled to a jury trial on the matters addressed herein[11] and (2) he and Mon River did not agree to proceed before the Special Master for any purpose other than organizing matters prior to a jury trial.  (*See* Doc. No. 134, Renewed Motion for a Jury Trial and Objection to the Use of a Special Master; Doc. No. 135,  Memorandum in Support of Renewed Motion for a Jury Trial and Objection to the Use of a Special Master ("Renewed Mot. Memo"); and Doc. No. 207, Amendment to Smith and Mon River Towing's Memorandum in Support of Renewed Motion for a Jury Trial and Objection to the Use of a Special Master.)

---

[11]  Although the motions and briefs imply that Smith and Mon River jointly move for a jury trial, Mon River's claims against Ingram arise only in the context of the limitation of liability actions which, as discussed below, do not provide a claimant with a right to a jury trial.  Therefore, the Court will proceed on the logical inference that Smith alone is moving for a jury trial.

A.    Right to a Jury Trial

On January 22, 2004, upon motions by Ingram and Mon River, the Court concluded that Smith was not entitled to a jury trial on the claims he had raised in the suits brought by those entities for exoneration and/or limitation of liability.[12]  In the Matter of the Complaint of J.A.R. Barge Lines, 307 F. Supp.2d 668 (W.D. Pa. 2004).  The Court found it was universally agreed that a jury trial was not available as a rule for claimants in suits brought by vessel owners seeking exoneration or limitation of liability.  Id. at 673-674; see also Pickle v. Char Lee Seafood, Inc., 174 F.3d 444, 450 (4th Cir. 1999) ("Insofar as claimants proceed in a limitation-of-liability action, they are not entitled to a trial by jury, even if the basis of their claim for fault is made under the Jones Act"), and Complaint of Consolidation Coal Co., 123 F.3d 126, 131-132 (3d Cir. 1997), discussing two exceptions to this rule which are not applicable here.

On April 5, 2006, more than a month after the Court entered its order pursuant to Fed.R.Civ. P. 53, Smith renewed his motion for a jury trial, arguing as he had earlier, that "when matters tried to a judge in common law and matters tried to a jury by modern Congressional statute meet in a single case, the court should order a trial by jury to resolve said conflict."  (Renewed Mot. Memo at 2.)  Smith argued that after the Court's previous decision, he filed a separate proceeding against Tri-River under the Jones Act.  Citing Fitzgerald v. United States Lines Co., 374 U.S. 16 (1963), and Romero v. Bethlehem Steel Corp., 515 F.2d 1249 (5th Cir. 1975), Smith argued that "[b]ecause this Court has seen fit to consolidate all matters into one proceeding, Plaintiff's jury trial is sandwiched between two cases that have been ordered triable by a judge and a fourth that has

---

[12]  The Court also addressed Smith's demand for punitive damages and determined that although the United States Court of Appeals for the Third Circuit had not spoken directly on the question of whether punitive damages were available under general maritime law in connection with an employer's alleged failure to pay maintenance and cure, when faced with this issue, the Court of Appeals would likely follow the majority of courts and conclude that such damages were unavailable.  J.A.R. Barge, 307 F. Supp.2d at 673.  The demand for punitive damages is not renewed in any of Smith's pleadings now under consideration, except a passing mention without argument in his Reply Memorandum in Support of Renewed Motion for a Jury Trial and Objection to the Use of a Special Master, Doc. No. 211, at 4.

never been formally ordered one way or the other," referring apparently to the complaint for exoneration and/or limitation of liability by Tri-River.  (Renewed Mot. Memo at 3.)

As noted above, after Smith filed suit against the Tri-River parties on May 19, 2004, Tri-River filed its own complaint for exoneration and/or limitation of liability.  The Court finds no reason to revisit its conclusion that despite Smith's demand for a jury trial for the claims he filed in Tri-River's limitation of liability action, a jury trial is not available in such actions.  However, the Court will discuss the jury demand made in Smith's own suit against Tri-River.

In his suit, Smith alleged that negligence and unseaworthiness on the part of the *Bill Dyer* caused or contributed to the severity of his accident.  Smith's suit was brought under "general admiralty and maritime negligence," as well as under the Jones Act.  The Jones Act provides that a seaman who sustains personal injury in the course of his employment may maintain an action against his employer for damages at law, with the right to trial by jury.  *See* 46 U.S.C. § 30104. This right to a jury trial, created by the "saving to suitors" clause of 28 U.S.C. § 1333, creates a conflict with the general rule that a court sitting in admiralty will hear the proceedings without a jury. *See* Gorman v. Cerasia, 2 F.3d 519, 524 (3d Cir. 1993).  However, the threshold question here is whether Smith can establish an employment relationship with the *Bill Dyer* or the Tri-River corporations.  If Smith cannot establish such a relationship, his negligence and unseaworthiness claims against Tri-River may be brought only under general admiralty and maritime law, thereby excluding the right to a jury trial.

In his Report and Recommendations, the Special Master first summarized the factors which pertain to a claim that a vessel owner has breached the absolute and non-delegatable duty of providing a Jones Act seaman with a seaworthy vessel.  (Conclusions of Law 2-3.)  In Conclusion of Law 4, the Special Master found Smith's claim that he was a seaman with regard to the *Bill Dyer*

necessarily failed as a matter of law.[13]  (*See also* Finding of Fact 5, note 2, to which Smith does not object.)

The Jones Act requires a plaintiff seeking recovery for injuries caused in whole or in part by maritime negligence to establish his status as a seaman, that is, "an employment relationship, either with the owner of the vessel or with some other employer who assigned the employee to a task creating the proper connection with a vessel."  Brogan v. United N.Y. Sandy Hook Pilots' Ass'n, Inc., *et al.*, 213 F. Supp.2d 432, 435 (D. N.J. 2002).  The Supreme Court has identified two "essential requirements" for seaman status:  (1) the "employee's duties must contribute to the function of the vessel or to the accomplishment of its mission;" and (2) the employee must establish that he has a "connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both its duration and its nature."  Chandris, Inc. v. Latsis, 515 U.S. 347, 368 (1995) (internal quotations and citations omitted).  The question of whether an individual is a seaman with regard to a certain vessel "is a mixed question of law and fact, and it often will be inappropriate to take the question from the jury."  Harbor Tug & Barge Co. v. Papai, 520 U.S. 548, 554 (1997).  Even so, where there is no evidence from which reasonable persons might draw conflicting inferences on either of the elements of the seaman test, the court may decide the issue as a matter of law.  Chandris, 515 U.S. at 369  ("On the other hand, if reasonable persons, applying the proper legal standard, could differ as to whether the employee was a 'member of a crew,' it is a question [of fact]"); *see also* Bernard v. Binnings Constr. Co., 741 F.2d 824, 828 (5th Cir. 1984), and James v. Wards Cove Packing Co., No. 05-35337, 2006 U.S. App. LEXIS 29852, *3-*4 (9th Cir. 2006), in which courts determined seaman status under the Jones Act in deciding motions for summary judgment.

---

[13]  In the transcript of the hearing, the Special Master stated that he had determined that as a matter of law, Smith could not pursue a Jones Act claim against either Ingram or Tri-River.  (Tr. 10.)  While the Special Master made no explicit Conclusion of Law regarding Smith's relationship with Ingram, Smith does not pursue such a claim in his objections to the R&R.

The first prong of the Chandris test focuses on the type of employment in which the plaintiff was engaged when he was injured. While the plaintiff does not need to be involved "in navigation or contribute to the transportation of the vessel," he "must be doing the ship's work." McDermott Int'l v. Wilander, 498 U.S. 337, 355 (1991). The second prong focuses on the employee's status vis-a-vis a particular vessel, most usually based on where the injury took place and why the employee was working at that location. The "total circumstances of an individual's employment must be weighed to determine whether he had a sufficient relation to the . . . vessels." Chandris, 515 U.S. at 370 (internal quotation omitted).

In his objections to the Special Master's Report and Recommendations,[14] Smith argues the Rose G. and the Bill Dyer were both were in the service of Ingram, performing commercial operations under contract for Ingram's profit. (Mark Allen Smith and Mon River Towing, Inc.'s Objections to Report and Recommendations, Doc. No. 212, at 11.) Therefore, Smith's undisputed status as a seaman with regard to the Rose G. caused him to be "connected to, and by proxy," in the service of the Bill Dyer. (Id.) No citation to law is offered to support this "proxy" argument and the Court's independent research has failed to discover such support.

Smith does not deny that throughout this litigation, he has consistently claimed his employer at the time of the accident was Mon River, nor has he denied that Mon River paid full maintenance and cure to him. That does not end the inquiry, however, because at least one Court of Appeals has recognized it is possible for a seaman to have more than one employer for purposes of the Jones Act. See Spinks v. Chevron Oil Co., 507 F.2d 216, 224-226 (5th Cir. 1975), overruled on other grounds by Gautreaux v. Scurlock Marine, 107 F.3d 331, 339 (5th Cir. 1997). For instance, a third party such as Tri-River or the Bill Dyer could have become Smith's employer by "borrowing" him and assuming control over his work. See Gaudet v. Exxon Corp., 562 F.2d 351, 355-356 (5th

---

[14] Curiously, these arguments are not raised in the briefs submitted in support of his motion and renewed motion for a jury trial, Doc. Nos. 135 and 207.

Cir. 1977), setting out a nine-factor test to determine the employer for purposes of the Jones Act.[15] Whether a person is a borrowed servant constitutes an issue of law for the district court to determine.  Melancon v. Amoco Production Co., 834 F.2d 1238, 1244 (5th Cir. 1988).  The Court need not consider the Gaudet factors in detail, however, because Smith has provided absolutely no evidence to support a finding that his work was controlled by Tri-River or the *Bill Dyer*.

In ascertaining whether a seaman has a substantial connection to a vessel in navigation – the second prong of the Chandris test -- the Supreme Court has broadened the category from a relationship with just one vessel to include "an identifiable group of . . . vessels."  Chandris, 515 U.S. at 368.  There is no evidence of any connection between the *Rose G.* and the *Bill Dyer* which would put them into an identifiable group of vessels other than the fact that both Mon River and Tri-River had entered into contracts with Ingram.  The two vessels were owned and operated by separate companies and performed different functions for Ingram, i.e., the *Rose G.* was the harbor boat at the Dravosburg Landing, responsible for servicing Ingram customers in the area, building tows for line boats using the Landing, and moving barges, while the contract between Ingram and Tri-River provided that the *Bill Dyer* would be engaged in towing barges only.  (Transcript of Hearing, Doc. No. 252, "Tr.," at 63, 1311-1312, and Tri-River Exhibit N.)  Both Kurowsky and Charles Fey ("Fey"), the captain of the *Bill Dyer*, testified at the hearing that they did not know each other prior to this litigation other than by radio communication.  (Tr. 385, 456.)  There is no evidence which would establish a relationship between Smith and the *Bill Dyer* except that Smith recognized the vessel because it worked in the area of the Dravosburg Landing; Fey testified that

---

[15]  These nine factors include: (1) control over the employee and the work he performs beyond mere suggestion of details or cooperation; (2) whose work is being performed; (3) the presence of an agreement, understanding, or meeting of the minds between the original and the borrowing employer; (4) the employee's acquiescence to the new work situation; (5) termination of the original employer's relationship with the employee; (6) the source of tools and place for performance; (7) the length of the new employment relationship; (8) the right to discharge the employee; and (9) the obligation to pay the employee.  Gaudet, 562 F.2d at 355-356.

he had never met Smith prior to this litigation.  (Tr. 358.)  Nor does Smith explain how his work aboard the *Rose G.* contributed to the function or completion of the mission of the *Bill Dyer* or how Tri-River controlled the work he performed.  Finally, this Court has been unable to identify any reported opinion in which an employee of one shipowner has been deemed to be a seaman affiliated with another shipowner simply because both shipowners have been engaged by a third entity to perform similar tasks.

Based on Smith's failure to come forward with any evidence to support a Jones Act relationship between the *Bill Dyer* and himself, the Court therefore affirms the Special Master's conclusion of law that  Smith was not a Jones Act seaman vis-a-vis the Tri-River parties. Consequently, he has no right to a jury trial on the matters raised in his suit against them.

B.    Objection to the Scope of the Proceedings before the Special Master

Smith and Mon River claim that at the March 1, 2006, settlement conference,  "It was not made clear . . . that the Special Master appointed in this case was to hear evidence and oversee witness testimony, functions which Smith's counsel asserts — and always has asserted – is the province of the jury in this matter." (Renewed Mot. Memo at 3.)  In an amendment to this motion (Doc. No. 207), filed on September 29, 2006, they again argue that they did not consent to an evidentiary hearing or a trial before the Special Master and that appointment of the Special Master for an evidentiary hearing is void under Federal Rule of Civil Procedure 53 without such consent.  (Id. at 2.)

According to Smith and Mon River, the federal rules provide that a special master may be appointed to hold trial proceedings only when (1) counsel consent to such proceedings or (2) there is some exceptional condition or need to perform difficult damage computation.  They argue that these cases could only be referred to a Special Master for trial proceedings with their consent, which has not been given.  They contend that during the March 1, 2006, settlement conference, the Court led them to believe the Special Master would not conduct trial proceedings, contrary to

14

the pre-trial order entered by the Court on March 2, 2006.  Smith and Mon River assert that they

believed the role of the Special Master would be limited to seeing that pre-trial matters were timely

organized for presentation to Court at the scheduled trial date.[16]

> The Court Order of March 2, 2006 clearly stated that it was appointing
>
> with the consent of the parties, Mark Shepard to serve as Special Master, pursuant to Federal Rule of Civil Procedure 53, for the purpose of hearing arguments and evidence of the parties and preparing a Report and Recommendations for submission to the Court.

(Pre-Trial Order (Non-Jury Trial), Doc. No. 112.)

Smith and Mon River's argument that they did not understand the extent of the Special

Master's authority is undercut by several actions they took (or failed to take) in the period between

March 2 and September 20, 2006, when the Special Master issued his report.  On March 7, 2006,

they filed a motion for clarification of the Pre-Trial Order concerning expert witness reports, but did

not request clarification of the purpose of the hearings before the Special Master.  The scope of

the Special Master's responsibilities was further reinforced when Smith and Mon River submitted

motions for summary judgment to the Court on March 13, 2006, only to withdraw them when they

realized they had "misinterpreted" the Court's Pre-Trial Order and should have submitted them to

the Master.  The same order established dates by which the parties were to provide witness lists,

file motions *in limine*, etc.  At least two of those actions by Smith and Mon River, namely, providing

their list of trial witnesses and their proposed findings of fact and conclusions of law to the Special

Master and opposing counsel, were to have been completed by March 24, 2006.  There is nothing

from which to conclude that they did not meet those assigned deadlines.  If then, it was true that

---

[16] As Tri-River points out, Smith and Mon River's argument that they consented only to proceeding before the Special Master to organize pre-trial matters, i.e., the duties set forth under Rule 53(a)(C), is unavailing because consent of the parties is not required for appointment of a special master to oversee such tasks.  (Response of Tri-River . . . to Amendment of Smith and Mon River Towing's Memorandum in Support of Renewed Motion for a Jury Trial and Objection to Use of a Special Master, Doc. No. 209, at 5.)

Smith and Mon River did not understand at the settlement conference that the Special Master was to "hear evidence and oversee witness testimony," the scope of his responsibilities should have been abundantly clear before they filed their demand for a jury trial and objection to proceeding before the Special Master on April 5, 2006.[17]

In its response, Tri-River points out that whether or not Smith and Mon River understood the scope of the Special Master's duties in March 2006, they waived any objections to such proceedings by their full participation and failure to renew their objection in a timely manner.  For example, Tri-River asserts (without refutation) that Smith and Mon River participated in at least two pre-hearing conferences on May 11 and June 29, 2006.  In particular, when asked at the second conference if there were any other unresolved matters to be addressed before the hearing, Smith and Mon River did not mention their outstanding demand for a jury trial and objections to proceeding before the Special Master.  (Response of Tri-River . . . to Amendment of Smith and Mon River Towing's Memorandum in Support of Renewed Motion for a Jury Trial and Objection to Use of a Special Master, Doc. No. 209, at 3.)  Despite Smith's arguments that he and Mon River had no choice but to attend the hearing and faithfully try their case or risk contempt of Court, the Court agrees with Tri-River that by continued participation in the proceedings before the Special Master, Smith and Mon River waived any objections thereto.

---

[17]  Smith and Mon River also argue that they should have been permitted to suggest candidates for the Special Master in addition to those recommended by Ingram and Tri-River at the March 1, 2006, conference.  However, such a request was never made in writing to the Court.  They also renew their argument that Smith should not be compelled to contribute to the cost of proceedings before the Special Master in order to "uphold both the spirit and the letter of the law," i.e., 28 U.S.C. § 1916.  (Doc. No. 207 at 2-3.)  The Court has previously determined that the cited statute pertains only to the initial filing of certain seaman's suits without prepayment or fees, not to costs associated with subsequent proceedings.  The Order of March 2, 2006, addressed this subject by directing the parties to share the Special Master's fees.

IV.   **SUMMARY OF THE SPECIAL MASTER'S RECOMMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

A.   <u>Findings of Fact</u>

Most of the relevant facts have been summarized above in the history of the accident. Briefly stated, the Special Master made the following additional findings of fact concerning the events of January 21, 2003.

1. *Conditions at Ingram's Dravosburg Landing and on Barge 4833*: Contrary to arguments raised by Smith and Mon River, Ingram was not subject to lighting standards established by the Occupational Safety & Health Administration ("OSHA") because "cargo handling operations" at the facility, i.e., removal of coal residue from barges as they came into the Landing to be cleaned (*see* Tr. 28, 60), did not take place at night. Consequently, Ingram had no legal or statutory duty to provide lighting in addition to that provided by towboats whose crews performed night-time fleeting operations. Moreover, Smith and Mon River failed to offer sufficient credible evidence to establish that the allegedly inadequate lighting at the Dravosburg Landing was a substantial contributing cause of Smith's accident and injuries. Nor was there sufficient evidence to support a finding that "junk lines"[18] on the deck of Barge 4833 contributed to the accident as alleged. (Findings of Fact 38-49.)

2. *Mon River's Rehiring of Smith*: Smith was originally hired as a deckhand in 1997, but fired after he failed a random drug test in May 1999. In October 2001, Watts interviewed Smith again and decided to rehire him. Despite a criminal background check performed prior to rehiring Smith which revealed a conviction for driving under the influence in February 2001, given his

---

[18]  Barges are equipped with both portable and stationary rigging. The latter is attached to the barge by means of a shackle, D-ring, wire clamp or retaining bar and is used to attach barges together. (Tr. 56, 860-861, 719-720; *see also* Ingram Exhibit J, Section VI, p.4.) Although stationary rigging is wired to the barge, it can be removed if it needs to be replaced, but replacement was done by Ingram, not by the towboat crews. (Tr. 106; Exhibit J, <u>id.</u>) The phrase "junk lines" does not refer to the quality of the lines in question, but is simply a term used on the river to describe rigging. (Tr. 479-480.)

previous satisfactory performance for the company in 1997-1999 and the fact that he had successfully undergone drug screening as part of the rehiring process, Mon River was not negligent in rehiring Smith as a lead deckhand.  (Findings of Fact 50-54.)

   3.  *Actions of the Bill Dyer*:  Although there was disputed and conflicting testimony about whether the *Bill Dyer*'s running lights and/or radio were operational at the time it passed the *Rose G.* and the barges, there is no dispute that (1) Smith was aware of the passing towboat, (2) Kurowsky was aware of the *Bill Dyer* and radioed that it could proceed at its discretion, and (3) Fey spoke by radio with Kurowsky about the accident later that night.  More importantly, although the passing of the *Bill Dyer* could have contributed to the downriver movement of the *Rose G.*, both Kurowsky and Smith, based on their past experience, were familiar with the hydraulic effect of passing vessels on the movement of a towboat or barge.  Finally, there was no evidence to support a finding that the *Bill Dyer* proceeded at an excessive speed or otherwise created an abnormal wake or hydraulic displacement as it passed the *Rose G.*  (Findings of Fact 21, 22, 27, 28.)

  B. <u>Conclusions of Law</u>

   The Special Master also recommended the following conclusions of law:[19]

   1.  *Smith's Jones Act Claims against the Bill Dyer and Tri-River*:  In order to assert a claim that the owner of a vessel violated its absolute duty to provide a seaworthy vessel for its crew, the claimant must quality as a seaman with respect to the allegedly unseaworthy vessel. Smith, as a matter of law, cannot assert an unseaworthiness claim against Tri-River Marine as the owner, nor against Tri-River Fleeting & Harbor Service as the owner *pro hac vice*, of the *Bill Dyer* because he failed to satisfy the two-prong <u>Chandris</u> test for qualifying as a seaman with respect to that vessel. (Conclusions of Law 1-4.)

   2.  *Smith's Jones Act Claims against Ingram:* Although Smith's possible status as

---

   [19]  Because Smith and Mon River raise objections to almost all of these ultimate conclusions, to avoid redundancy, citations to the relevant case law will appear with the analyses which follow.

a seaman with regard to the Ingram barges which were regularly moved by the *Rose G.* is a closer question, it is not necessary to address this issue because there was insufficient evidence to show that Barge 4833 was unseaworthy at the time of his accident, i.e., that it and its appurtenances were not "reasonably fit" for their intended purpose.  (Conclusions of Law 5-12.)

3.  *Smith's General Maritime Negligence Claims against Tri-River and Ingram:*  Tri-River was not negligent, i.e., did not breach its duty to exercise reasonable care under the circumstances, when the *Bill Dyer* passed the *Rose G.* after having been instructed by Kurowsky to proceed.  Smith failed to establish that any of Ingram's allegedly negligent acts or omissions, i.e., failure to provide adequate lighting at the Dravosburg Facility, failure to implement proper safety rules, and/or allowing defective rigging on Barge 4833, was a proximate or legal cause of his injuries.  (Conclusions of Law 13-16.)

4.  *Mon River's Indemnity Claims:*  Because neither Ingram nor Tri-River was found liable to Smith under any causes of action asserted against those entities, Mon River's indemnity and/or contribution claims to recover all or part of the maintenance and cure it provided to Smith must fail as a matter of law.  (Conclusion of Law 17.)

5.  *Ingram's Indemnity Claim Against Mon River:*  Under the Ryan doctrine, Mon River owed Ingram an implied warranty of workmanlike performance with regard to the harbor boat services the *Rose G.* and its crew provided at the Dravosburg Landing.  Ingram's indemnity claim against Mon River is therefore valid, even though Ingram incurred no liability to either Smith or Mon River.  Consequently, the only amounts Ingram could recover for breach of the Ryan implied warranty are the litigation expenses it incurred in defending Smith's claim.  Because Mon River had no control whatsoever over Smith's right to assert claims against Ingram for general maritime negligence and/or unseaworthiness, Ingram is not entitled to recover those expenses from Mon River.  (Conclusions of Law 19-27.)

6.  *Cross-Claims by Ingram and Tri-River:*  Because Smith and Mon River failed to

show that either Ingram or Tri-River was negligent or that actions or conditions attributed to either of them were the proximate cause of Smith's injuries, Ingram and Tri-River are exonerated from liability.  Consequently, there is no need to further consider Ingram and Tri-River's limitation actions.  (Conclusion of Law 18.)  Moreover, the cross-claims of Ingram and Tri-River for indemnity and/or contribution are rendered moot as a result of their exoneration from liability to Smith and/or Mon River.  (Conclusion of Law 28.)

## V.    OBJECTIONS BY SMITH AND MON RIVER TO THE SPECIAL MASTER'S REPORT

### A.    Objections to Findings of Fact

Smith and/or Mon River raise objections to 26 of the 54 Findings of Fact recommended by the Special Master.  The Court will address only those Findings to which objections are made,[20] using the number of the Special Master's Finding for identification.

18.  Smith objects to the Special Master's Finding of Fact 18 that while the crew of the *Rose G.* was preparing to move a four-barge tow to the clean-out fleet at Dravosburg Landing, the *Rose G.* "was faced up on Barge 4833" and "Becker and Smith wired Barge 4833 to the next barge in line (ING 2008)."  Smith argues that the evidence shows Barge 4833 was already wired to Barge 2008 before Smith began his shift at 6:00 p.m. on January 21, 2003, and that the *Rose G.* was faced up to Barge 13618 as the fleet of barges was moved upriver to the repair fleet.  Smith also argues that Ingram did not give Smith the tools necessary to remove the damaged rigging from the barge.

The Court overrules this objection as irrelevant because the evidence clearly shows that after the fleet of barges had been moved to the repair/cleanout area and the *Rose G.* was in the process of moving only Barge 4833, the towboat was undoubtedly faced up to that barge when the

---

[20]  Smith and Mon River's objections have been compiled from their Objections to the Report and Recommendations, Doc. No. 212; their Amended Objections to Report and Recommendations, Doc. No. 220, and their Reply Memorandum in Support of Their Objections to the Special Master's Report and Recommendations, Doc. No. 251.

accident occurred.  (Tr. 603, 639 and Tri-River Exhibit DD.)  Smith's argument about not having

tools to remove the damaged lines is also irrelevant for two reasons: first, it is outside the scope

of the Finding and second, there is no evidence he requested such tools from Ingram or from

Kurowsky.  In fact, Kurowsky testified that Smith and Becker had handled the wires holding the

barges together several times earlier that day and that neither had complained about bad rigging

on any barges.  (Tr. 497-498.)

       20.  In Finding of Fact 20, the Special Master found that Kurowsky and the crew of

the *Rose G.*, including Smith and Becker, had "substantial experience" safely performing the

rounding-to procedure.  Smith argues that the Finding seems to imply that tying one barge to

another is typical for the rounding-to procedure; however, the record shows Kurowsky usually

completed rounding-to without catching a line and the appearance of the *Bill Dyer* interrupted this

otherwise familiar procedure.

      The Court finds this objection entirely outside the scope of the Finding.  Nothing in the

Special Master's finding refers to tying one barge to another, catching a line, or the effect of the

*Bill Dyer*'s appearance on the rounding-to procedure.  Kurowsky testified he and the crew had

performed the procedure numerous times, there was nothing unusual about the procedure that

night, and that he sometimes had a deckhand put a line on a barge to hold it in position.  (Tr. 505.)

Becker corroborated this testimony at his deposition.[21]  (Becker Deposition at 54, 55, 57, 188.)

Smith's argument that "this Court should take special note of the fact that Smith would not have

---

[21]  All deposition excerpts referred to herein can be found in the "Designated Trial Depositions" provided to the Special Master.

    Becker testified at a deposition in September 2005, but refused to accept a subpoena to appear at the evidentiary hearing.  (Tr. 329-330.)  The Special Master recognized the difficulty in assessing the credibility of a key witness who refused to appear and determined that he would reserve judgment on Becker's testimony.  (Tr. 1515-1516.)  At various points in their objections to the R&R, Smith and Mon River urge the Court to reject the testimony of a "subpoena dodger" who was "unduly influenced at his deposition."  (*See*, e.g., Doc. No. 251 at 3.)  All parties, including Smith and Mon River, had the opportunity to point out to the Special Master those portions of Becker's deposition testimony which they believed supported their arguments.  Because the Special Master accepted Becker's testimony (at least in part), the Court will do likewise.

been using the line that took off his leg had the *Bill Dyer* not appeared" is unpersuasive in light of testimony that lines were sometimes used in the rounding-to procedure to hold the position of the barge when the procedure was performed in a busy part of the river. (Tr. 527.)

        22.   The Special Master concluded that although there was conflicting testimony about whether the *Bill Dyer*'s running lights and radio were operational when it passed the *Rose G.*, there was no need to resolve that conflict because Kurowsky testified he was aware of the passing vessel and had radioed the *Bill Dyer* to pass at its discretion. (Finding of Fact 22.)  Smith objects to this Finding because it "ignores the importance of timing."  That is, had the *Bill Dyer* been equipped with two working radios and Perko running lights,[22] Kurowsky would have become aware of the other boat much earlier and could have aborted the rounding-to procedure or chosen another procedure.  According to Smith, the Finding "discounts the advantages *M/V Bill Dyer*'s compliance with applicable law would have given the crew of the *M/V Rose G.*"[23]  He also argues that Kurowsky "exhibited and testified to an implied degree of fatalism about the situation," based on Kurowsky's testimony that when Smith radioed him about the approach of the *Bill Dyer*, "I already had my procedure, I was going through it.  There was nothing I could have, you know, changed." (Tr. 526.)

    Smith testified he became aware of the *Bill Dyer* while the towboat was some 500 feet downriver beyond the end of the moored barges, i.e., 100 or 200 feet below the Mansfield Highway Bridge, while the *Rose G.* was still in the process of moving Barge 4833 into position.  (Tr. 700.) Kurowsky stated he became aware of the other boat when it was "300 feet, maybe 400 feet down below the bridge."  (Tr. 441.)  He had already started the rounding-to procedure, i.e., his stern was already out from the fleet.  (Tr. 441-442.)  Smith stated that about five minutes elapsed between

---

[22]   "Perko" simply refers to one manufacturer's marine light bulbs.  To the extent Smith suggests "compliance with applicable law" requires use of Perko lights specifically, the Court is aware of no such regulation.

[23]   This point is discussed in more detail below in Smith and Mon River's objection to Conclusion of Law 14.

the time he first saw the other boat and the accident occurred. (Tr. 713.) Therefore, even assuming Kurowsky had not already seen the *Bill Dyer* when Smith radioed him about its approach, Smith and Kurowsky both would have had sufficient time to take any safety measures necessary to compensate for the effect of the *Bill Dyer*'s passing. Although Smith is correct that Kurowsky stated he could have delayed beginning the rounding-to procedure if he had been aware there was another boat in the vicinity, Kurowsky also testified that the crew of the *Rose G.* was accustomed to traffic in the river near the Dravosburg Landing, the crew did not attempt to hurry the rounding-to procedure because of the passing vessel, he had the barge under control, and the passing of the *Bill Dyer* was not of concern. (Tr. 526-527, 541.) He further testified that he told the *Bill Dyer* via radio to pass at its discretion,[24] and that he could have told the other towboat to stop while he completed rounding-to, but did not. (Tr. 530.) As to Smith's argument that Kurowsky was "fatalistically" resigned to the situation, the Court finds first that this objection is speculative and outside the scope of the Finding of Fact. Moreover, after a thorough review of Kurowsky's entire testimony, the Court is left with the overall impression of an experienced towboat captain who believed he had an ordinary situation under control.

        23.  The Special Master found that because the stern of the *Rose G.* was not facing directly downriver toward the *Bill Dyer*, Rule 13 of the Inland Navigational Rules pertaining to an overtaking situation was not applicable. (Finding of Fact 23.) According to Smith, this Finding is incomplete because it does not specify whether the situation was alternatively a crossing or a head-on meeting which would have implicated Rule 14 or 15. (*See* Tr. 1492-1497 where these situations are described by Earl Darst ("Darst"), the expert for Ingram and Tri-River.) Tri-River responds that Smith never asserted or offered testimony or evidence relating to Rule 14 or 15, relying instead

---

[24]  At his deposition, Kurowsky stated he spoke to the pilot of the *Bill Dyer* but at the hearing denied doing so until confronted with his earlier statement that he had radioed the other vessel but received no response. (Tr. 531-532.)

only on Rule 13 in his claim that the *Bill Dyer* had violated the Inland Navigation Rules.  Therefore, not only was it unnecessary for the Special Master to make a finding as to either of those Rules, Smith cannot now change his theory of the case to assert a new claim.  (Response of Tri-River . . . to Mark Allen Smith and Mon River Towing Inc.'s Amended Objections to Report and Recommendations, Doc. No. 229, at 7.)

The Court notes initially that contrary to his assertion that his complaint placed Tri-River on notice for potential violation of *any* of the Rules, Smith alleged only that "the negligence and unseaworthiness of Defendant M/V *Bill Dyer* coalesced in the form of a failure to send radio signals as required by the rules of inland navigation."[25]  (CA No. 04-753, Complaint, ¶ 18.)  In his claim filed in Tri-River's limitation of liability suit, the Inland Navigation Rules are never mentioned.  (CA No. 04-1611, Doc. No. 4.)  Thus, it cannot be said that Tri-River was given fair notice of a violation of Rule 13, 14, or 15.  The Court agrees with Tri-River that there was no testimony regarding violation of Rules 14 or 15 at the hearing and Smith fails to identify such testimony in his memoranda in support of his objections.

More importantly, Smith's argument that violation of any of those three inland navigation rules is material because it would have triggered the "*Pennsylvania* Rule" is entirely unpersuasive.[26]

---

[25]  Failing to maintain a radio capable of receiving and transmitting at certain frequencies and/or failing to maintain a radio watch on vessels of specific dimensions or weights while navigating is a violation of 33 U.S.C. § 1203.  The Court has been unable to pinpoint any discussion of this Rule during the hearing held before the Special Master, although there is testimony regarding whether radios on the *Bill Dyer* were operational on January 21, 2003.  (*Compare* Fey testimony at Tr. 345-347, 375, 382-383, with Fedkoe testimony at Tr. 1105-1106 and Mosesso testimony at Tr. 1273-1274.)

[26]  Violation of maritime-related statutes and regulations by a vessel or other object involved in a collision invokes the *Pennsylvania* Rule.  In re: Nautilus Motor Tanker Co., 85 F.3d 105, 113 (3d Cir. 1996), *citing* The Pennsylvania, 86 U.S. 125, 126 (1874), *overruled in part on other grounds*, United States v. Reliable Transfer, 421 U.S. 397 (1975).  As originally stated, the *Pennsylvania* Rule provides that "the liability for damages is upon the ship or ships whose fault caused the injury.  But when . . . a ship at the time of a collision is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster.  In such a case, the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been."  *The Pennsylvania*, 86 U.S. at 136.  A party alleging that the *Pennsylvania* Rule applies must demonstrate by a

As a general matter, the *Pennsylvania* Rule is "limited to the violation of a statute intended to prevent the catastrophe which actually transpired." Poulis-Minott v. Smith, 388 F.3d 354, 365 (1st Cir. 2004) (internal quotations and citations omitted).  Rules 13, 14, and 15 which govern, respectively, the direction each vessel is to navigate when overtaking, meeting in a head-on situation, or crossing each other, are intended to prevent collisions between vessels.  *See* 33 U.S.C. §§ 2013-2015.  Here, there was not even speculative testimony or evidence that the *Bill Dyer* and *Rose G.* were in danger of collision, although the former passed within 40 to 50 feet of the latter.  Thus, even if the Special Master had found that the *Bill Dyer* violated one of the navigation rules, liability would not have been transferred to Tri-River by invoking the *Pennsylvania* Rule inasmuch as violation of those rules did not result in Smith becoming tangled in the line and being pulled overboard.  The Court finds the Special Master's omission of findings with regard to violation of Rule 14 or 15 is irrelevant to the resolution of these matters.

       24.  In Finding of Fact 24, the Special Master summarized the actions of Kurowsky, Becker, and Smith immediately after they became aware of the *Bill Dyer*.  Kurowsky touched the corners of Barges 4833 and 13613 together so Becker could step onto Barge 13613 to remove a line running between that barge and another, ING 1416. Kurowsky then radioed Smith to "catch a line" from the forward port timberhead on Barge 4833 to the adjacent timberhead on Barge 13613.  Smith walked down the deck of Barge 4833 to pick up a plastic leaving line approximately 40 feet long where he had placed it near the starboard forward corner of the barge.  Smith's objection to this Finding is similar to that in Finding of Fact 22, i.e., that the Special Master failed to take into account the fact that Kurowsky and Smith acted hurriedly to complete these actions

---

preponderance of the evidence: (1) the existence of a statute or regulation that imposes a mandatory duty; (2) the statute or regulation involves marine safety or navigation; and (3) the injury suffered is of the nature that the statute or regulation was intended to prevent. Nautilus Motor Tanker, 85 F.3d at 114, *citing* United States v. Nassau Marine, 778 F.2d 1111, 1116-1117 (5th Cir. 1985), and Folkstone Maritime v. CSX Corp., 64 F.3d 1037, 1047 (7th Cir. 1995).  Application of the *Pennsylvania* Rule is not limited to cases involving collisions.  *See* Wills v. Amerada Hess Corp., 379 F.3d 32, 43 (2d Cir. 2004) and cases cited therein.

because of the unexpected appearance of the *Bill Dyer*.  The Court has already addressed the question of whether Kurowsky and/or Smith was overly concerned about the presence of the *Bill Dyer* and responded by hurrying their actions.  The Court thus declines to elaborate further on the Special Master's accurate Finding.

> 25.  In relevant portion, Finding of Fact 25 states:
>
> Smith carried the leaving line across the deck [of Barge 4833] to the forward port timberhead, placed the eye of the line over the timberhead on Barge 4833 and then tossed a loop of the line over the port aft timberhead of Barge 13613.  As Smith was wrapping the line around the forward port timberheads on Barge 4833, he looked down and noticed that his right foot was in the loop of the line [on the deck].

Smith's first objection is that his injury was a fracture of the tibia and fibula of his right leg, not crushed anklebones.  This objection is entirely irrelevant since the Finding makes no mention of the injury at all.  The second objection is that Smith offered testimony about how his leg became entangled in the leaving line which contradicts the phrase "he looked down and noticed that his right foot was in the loop of the line."  The Court will address this objection below in the discussion of Finding 49 where the Special Master discusses Smith's testimony on this point.  Third, Smith objects to the Finding because it erroneously asserts that he wrapped a line on a timberhead of Barge 4833, i.e., he had not actually put wraps around the timberhead.  Smith argues that the eye of the line on Barge 4833 acted as an anchor for the rope and the wrapped loop on Barge 13613 acted as a pulley "that drug Mr. Smith overboard."  He contends that if he had completed  "a wrap," i.e., several turns of the line, around the timberhead on Barge 4833, his leg would have become lodged in that timberhead and broken there rather than pulling him overboard and breaking his leg on the timberhead of Barge 13613.

Smith claims there is a difference between "getting ready" to wrap a line and "wrapping the line," a distinction with which this Court is compelled to agree.  However, Smith overlooks the fact that Kurowsky testified that he heard, or believed he heard, Smith radio that he had "caught a line,"

indicating by use of the past tense that the action was complete.  (Tr. 527-528.)  Kurowsky also testified that the phrase "caught a line" as commonly used among towboat crews meant not only was the eye of the line around a timberhead, but the wrapping had been completed.  That is, when Smith radioed him that he had caught a line, Kurowsky assumed Smith meant he had wraps around the timberhead and the boat was "not going to go nowhere."  (Tr. 527-531, 592.)  The Court concludes that the Finding of Fact is accurately based on testimony offered at the hearing and overrules Smith's objection thereto.  (*See* Tr. 974-975, 978-980, 1388-1389.)

26.  The Special Master found that despite conflicting testimony on the question of whether the *Rose G.*'s engines were in reverse or disengaged at the time Smith was attempting to catch the line between the two barges, he credited Kurowsky's testimony that they were disengaged.  He concluded that even if the engines were disengaged, the *Rose G.* would have been carried downriver by its momentum and the current, causing the line to tighten around Smith's leg before he could remove it.  (Finding of Fact 26.)  Smith objects to the conclusion that the "downriver momentum" caused the line to tighten rather than hydraulic displacement from the *Bill Dyer* as it passed.  He further contends this Finding is illogical in light of Finding of Fact 24 that the last act of the *Rose G.* before disengaging its engines was to push Barge 4833 forward to touch Barge 13613.

The Court first notes that Smith does not object to the finding that the *Rose G.*'s engines were disengaged.  Kurowsky testified at his deposition that his purpose in telling Smith to catch a line was to prevent Barge 4833 from swinging into the path of the *Bill Dyer* as it passed.  (Kurowsky Deposition at 79-80.)  According to a diagram of the position of the barges and the *Rose G.* just prior to the accident, the forward end of Barge 4833 was at right angles to the side of Barge 1416 with the *Rose G.* directly faced up to the stern of Barge 4833 and the stern of the *Rose G.* facing out into the Monongahela River.  (Tri-River Exhibit EE.)  After the barges touched, Kurowsky let the downriver momentum and current bring the stern of the *Rose G.* around counterclockwise with

the intention of allowing the current to swing the stern of Barge 4833 downriver, parallel to Barge 1416 and under Barge 13613 in the fleet.  (Tr. 537.)  There is no evidence as to the amount of time which elapsed between touching the barges together (the end of forward motion) and disengaging the engines which would have let the boat move downriver with the current.  Thus, the Special Master's description of the movement of the barge and the *Rose G.* is accurately based on testimony proffered by the person who was in command of the vessel at the time.

Smith also argues that he,  Kurowsky, J.P. Jamison ("Jamison"), and Darst all testified that hydraulic displacement moved the *Rose G.*  (*See* Tr. 454, 540, 640, 179-181.)  Smith's expert Jamison described hydraulic displacement as a back-and-forth jerking movement.  That is, as the *Bill Dyer* passed the stern of the *Rose G.*, hydraulic displacement, or a "surge" of water, would cause the *Rose G.* and Barge 4833 to move away from the *Bill Dyer*, i.e., toward the moored barges, then backward toward the center of the river.  (Tr. 180-181, 289.)  He further testified that such a movement happens every time a vessel passes a fixed point or another vessel.  (Tr. 287.)  However, Kurowsky testified at his deposition that he did not recall any wake or "sucking" of the *Rose G.* and Barge 4833 back into the sailing channel as the *Bill Dyer* passed nor did he sense a jerk forward or backward.  (Kurowsky Deposition at 103.)  Smith also testified that he was familiar with the effect of wheel wash from passing boats and that he felt no jerk forward or wheel wash pulling the barge backward as the *Bill Dyer* passed.  (Tr. 779-780, 782-783.)

The Court concludes that the Special Master correctly gave less weight to the evidence tending to show that hydraulic displacement from the passage of the *Bill Dyer* had a significant effect on the speed at which the barge and the *Rose G.* moved downriver due to current and/or momentum.  Therefore, the Court does not find that he erred in his analysis of the events which resulted in Smith's injury and the objection is overruled.

27.  Smith objects to several points in Finding of Fact 27.  First, he objects to the Finding that Kurowsky had given the *Bill Dyer* permission to pass the *Rose G.* and was therefore

responsible to take any precautions he felt necessary in view of its passing.  Smith contends that

"the evidence was undisputed" that no one on the *Bill Dyer* actually heard that permission because

one of its radios was not operational and the other was tuned to a different channel.  The Court

notes it is not as firmly established as Smith claims that no one heard Kurowsky direct the *Bill Dyer*

to proceed.  (*See* note 24 above regarding Kurowsky's conflicting testimony about speaking to the

pilot on the other boat.)  Second, this objection would have some validity if, for instance, Kurowsky

had directed the *Bill Dyer* to stop while he completed the rounding-to procedure, but the other

vessel continued contrary to those instructions.  Since Kurowsky (1) took safety precautions to

prevent Barge 4833 from swinging out into the path of the *Bill Dyer* by directing Smith to catch a

line, and (2) expected the *Bill Dyer* to continue upriver, the facts support a finding that Kurowsky

was prepared for that passing.

Smith next argues that the Finding ignores the fact that the *Rose G.* had insufficient time

to properly avoid the *Bill Dyer* because that vessel failed to make a radio security call or display

proper lighting.  According to Smith, this inability to avoid the *Bill Dyer* increased the effects of the

hydraulic displacement caused by its close passing.  There is no evidence or testimony to support

the theory that the *Rose G.* tried to take any evasive action nor that the accident occurred because

the crew had to hurry their rounding-to procedure in order to avoid the other towboat.  Fey testified

it was common for towboats to work in close quarters near the Dravosburg Landing  (Tr. 398) and

Kurowsky testified he believed Smith already had a line on Barge 13613 when he told the pilot of

the *Bill Dyer* to proceed.  (Kurowsky Deposition at 80-81.)  Fey testified he checked the lights on

the *Bill Dyer* when he came on board that day and replaced several bulbs.  (Tr. 359-360.)  He also

stated that he kept the vessel's running lights turned on all the time because they had to be

physically unplugged, rather than just turning a switch.  (Tr. 363.)  This testimony was corroborated

by Brian Mosesso, owner of the Tri-River corporations, who explained that in order to turn off the

navigation lights, someone would have to open a breaker panel located behind a computer and

shut off the breaker manually.  (Tr. 1269-1272.)  Kurowsky admitted he did not mention that the *Bill Dyer* was running without lights in any of the four written reports he prepared within 12 hours of the accident.  (Tr. 521.)  Watts testified that Smith did not mention the absence of lights on the *Bill Dyer* when he took Smith's statement, otherwise he would have included it in his report.  (Watts Deposition at 94.)

Finally, the Special Master found that the *Bill Dyer* was in the "middle of the navigation channel" at the time it passed the *Rose G.*  Smith objects to this Finding as "impossible under undisputed testimony."   By Smith's calculation, the *Bill Dyer* was only 450 feet from the left descending bank, an unnecessary proximity which caused "vicious" hydraulic displacement and cost Smith his leg.

The Court recognizes that the "middle of the navigation channel" and the "middle of the river" are not necessarily synonymous since the navigation channel may lie closer to one bank than another due to the vagaries of water depth.  *See* numerous Supreme Court cases determining state boundaries at the middle of the main navigable channel and not along the line equidistant between the banks, e.g., Iowa v. Illinois, 147 U.S. 1 (1893);  Louisiana v. Mississippi, 202 U.S. 1 (1906);  Arkansas v. Mississippi, 250 U.S. 39  (1919);  New Jersey v. Delaware, 291 U.S. 361 (1934).  Both Smith and Kurowsky testified that the *Bill Dyer* was in the "middle of the river."  (Tr. 707 and 443, respectively.)  Becker testified the *Bill Dyer* was in the "middle of the navigation channel" with its required lights.  (Becker Deposition at 137-139.)

Smith asserts that the middle of the channel is 562.5 feet from the left descending bank of the river.  However, in reviewing his Exhibit B, a navigational chart of the Monongahela River, the Court estimates the entire river is only about 500 to 550 feet wide at Milepost 17, approximately where the Dravosburg Landing is located.  Thus, it is impossible for the middle of the channel to be 562.5 feet from either river bank.  Moreover, even if Smith merely erred in his mathematical analysis, the chart shows the sailing line, i.e., the middle of the navigational channel, at that point

30

is, to the best of the Court's ability to calculate, approximately in the middle of the river itself.  Smith fails to explain how he determined from Exhibit B that at this point in the river, the navigation channel runs "significantly closer to the right, descending bank of the river."  Therefore, Smith's contention that by moving up the middle of the river, or on the sailing line, the *Bill Dyer* violated inland navigation rules by passing in "unnecessary proximity" to the *Rose G.* is no more than unfounded speculation.

        28.   In Finding of Fact 28, the Special Master found there was "absolutely no evidence to suggest that the M/V *Bill Dyer* was proceeding at an excessive speed or otherwise creating an abnormal wake or wheel wash as it proceeded up river past the Dravosburg Landing."  Smith contends this Finding ignores evidence that the *Bill Dyer* passed too closely and without adequate warning for the *Rose G.* to take precautions against the hydraulic displacement, objections which have been discussed and rejected above.  He also objects to the fact that the Finding fails to note the depth of the water or the "depth" of the *Bill Dyer* or the *Rose G.*, both of which, he contends, are "decisive factors in the force of hydraulic displacement."[27]

        The Court again overrules these objections, first because Smith does not point to, nor has the Court been able to independently pinpoint in the transcript of the hearing, any evidence regarding the depth of the river where the accident occurred or of the "depth" of the *Rose G.* or the *Bill Dyer*, by which the Court assumes Smith means the vessel's draft.  While it is true, as Smith

---

    [27]  The Court is mystified by the cases on which Smith relies for this proposition.  <u>Houma Well Service, Inc. v. Tug Capt. O'Brien</u>, 312 F.Supp. 257 (E.D. La. 1970) concerns the loss of a barge being towed up the Mississippi River which capsized after the wake of a passing vessel caused it to list first in one direction then in the opposite direction.  <u>Id.</u> at 259.  The relevant evidence in the case had nothing to do with hydraulic displacement caused by one vessel passing another but rather the fact that the towboat crew knew the barge was unstable well before the other boat passed but failed to take any steps to remedy the situation.  <u>Id.</u> at 262.  There is no discussion of hydraulic displacement nor even a hint that the wake of the passing vessel (analogous to the *Bill Dyer*) was considered a proximate cause of the sinking of the barge.  Reliance on <u>The *S.C.L. No. 9*</u>, 37 F.Supp. 386 (E.D. Pa. 1939) is even more mysterious inasmuch as that case involved a lighter which capsized after it was overloaded with sulphur without the slightest hint that any other vessel was within hailing distance, much less that the depth of the water or the draft of the vessel was implicated in the accident.

claims, that his counsel cross-examined Darst about the depth of the water, Darst simply testified

that he did not know how deep the water was at that point in the river.  (Tr. 1421-1422.)  On the

other hand, there is, to the best of the Court's ability to discern, no scientific testimony about how

the depth of water or a vessel's draft affects the force of hydraulic displacement other than Darst's

statements that current, water depth, and vessel speed are all variables to be considered in

calculating hydraulic displacement.  (Id.)  It is impossible to conceive, therefore, how the Special

Master erred by failing to make findings of fact about evidence which was never presented.

29.  The Special Master found that prior to Smith's noticing his leg was in the bight

of the leaving line, he radioed Kurowsky and told him "got a line," a signal to Kurowsky that the

barges were secure and he could continue the rounding-to maneuver.  (Finding of Fact 29.)  Smith

objects to this Finding because (1) Smith testified he did not radio such a message to Kurowsky;

if Kurowsky thought he heard such a message, Becker must have inappropriately sent it; and (2)

uncontested evidence showed that tying a line was not part of the rounding-to procedure.

The Court notes, again, conflicting evidence on these points.  Becker, for instance,

distinguished between "flopping a barge," or rounding-to which is done using the towboat to nudge

the barge into position without tying the two barges together, and the activity he described as

occurring on the night of the accident when the barges are tied together in order for the boat to

pivot a barge into position.  (Becker Deposition at 54-55.)  Second, whether or not catching a line

is a normal part of the rounding-to procedure, Kurowsky testified that he and Smith discussed doing

so by radio and that he acted upon what he believed to be Smith stating he caught a line, together

with his own visual confirmation that he saw Smith toss a line toward the timberhead on Barge

13613.  (Tr. 527-531, 488.)

As the trier of fact, the Special Master was charged with the responsibility of determining

credibility, weighing evidence, and drawing reasonable inferences.  *See* Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 255 (1986); *see also* Canal Barge Co. v. Torco Oil Co., 220 F.3d 370, 377-378

(5th Cir. 2000), where the Court of Appeals noted that the credibility determinations of a magistrate judge faced with conflicting evidence in an admiralty case must be given "due regard" and should be rejected only if the court has a "definite and firm conviction that a mistake has been committed." The Court is not convinced that the Special Master erred by accepting Kurowsky's testimony rather than Smith's in finding that Smith did in fact radio Kurowsky that he "got a line." Moreover, contrary to Smith's assertion that the rounding-to procedure did not involve catching a line between barges, Kurowsky testified that this occurred on occasion. (Tr. 527.) In light of Kurowsky's testimony that he acted on what he believed to be Smith telling him he had caught a line, substantial evidence supports this Finding of Fact and Smith's objection is overruled.

      30. In Finding of Fact 30, the Special Master concluded that although Smith attempted to remove the line from his right leg and the wraps from the timberhead on Barge 4833, he was unable to do so before the downriver movement of the barge and the *Rose G.* pulled him into the river. Smith reiterates his objection to Finding of Fact 25, arguing that the wraps could not have been in place on a Barge 4833 timberhead since the timberheads are too close together to allow an adult man's leg to be pulled between them. Consequently, he contends, the only possible outcome under the Special Master's description of events was for his leg to have been broken on on Barge 4833, not Barge 13613.[28]

This argument is unsubstantiated and irrelevant. There is no evidence of his trajectory as he was pulled off the barge or where his leg was broken, except Becker's testimony that when he grabbed Smith on Barge 13613 to prevent him from being pulled back into the water, his leg was already broken. (Becker Deposition at 83-84.) Furthermore, this argument is irrelevant to the point

---

[28] Tri-River argues in their response to this and several subsequent objections that the objections should be dismissed out-of-hand because they were not renewed in the Amended Objections and were thereby waived. The Court declines to accept this argument inasmuch as Smith and Mon River stated in the Amended Objections that they were incorporating the original objections therein in the interest of aiding judicial efficiency.

of the Finding which is simply to state the series of events which occurred in the seconds before he was pulled into the water.

32.   The Special Master concluded in Finding of Fact 32 that when Becker radioed Kurowsky that Smith was overboard, "Kurowsky immediately took steps to stop any movement of the M/V *Rose G.*"  Smith objects that Kurowsky did not take any such steps and that the backward movement of the *Rose G.* was caused by hydraulic displacement from the *Bill Dyer*.

The Court finds this objection irrelevant.  Kurowsky testified he had disengaged the engines while the rounding-to procedure was underway and did not want to re-engage the engines in order to move forward or backward because he feared Smith might be injured by being pulled under the towboat.  Smith and Mon River fail to point to any evidence in the record which indicates that the *Rose G.* continued backward due to hydraulic displacement caused by the passing of the *Bill Dyer* at a velocity greater than that which was caused by the current and momentum, and the Court has been unable to independently identify such evidence on their behalf.  The objection is therefore overruled.

33.   Smith objects to the Special Master's conclusion that while lying on the deck of Barge 13613 waiting for medical assistance, Smith told Becker to remove beer cans from his room on the *Rose G.*  Becker subsequently passed this request along to Mike Petrola who found two empty cans and disposed of them in the river.  (Finding of Fact 33.)  Smith objects, based on his own testimony that none of these events occurred plus Petrola's testimony which "casts doubt on this idea,"[29] that no reasonable trier of fact could interpret the evidence the way it is described in this Finding.

---

[29]  Petrola testified at his deposition that Smith did not tell him directly to remove the beer cans, but instead Becker told Petrola that Smith had asked him (Becker) to remove the cans.  (Petrola Deposition at 42-43, 95.)  Petrola's testimony which "casts doubt on this idea" is apparently Petrola's statement he did not trust Becker, but he did not deny that Becker asked him to remove the beer cans from Smith's room or that he had done so.  (Id., 67-68.)

The Court finds this objection also irrelevant inasmuch as the Special Master explicitly found there was insufficient evidence to determine if Smith's use of alcohol played any role in causing the accident.  (*See* Finding of Fact 34 to which Smith does not object.)  Contrary to Smith's contention, there was more than sufficient evidence in the record from which the Special Master could have arrived at his conclusions in Finding of Fact 33.  (*See* Becker Deposition at 93-94 and Petrola Deposition at 42-43, 92-95.)  Therefore, this objection is overruled.

35.   Smith objects to Finding of Fact 35 which summarizes the actions of the paramedics who arrived at Dravosburg Landing approximately 45 minutes after the accident because there is no mention of the fact that it was so dark Petrola had use a flashlight to guide them to the deck of Barge 13163.  Smith argues that Petrola's deposition testimony in this regard supports his claims that lighting at the Landing was inadequate and contributed to the accident.

No paramedics testified at the evidentiary hearing so the only relevant evidence is Petrola's deposition testimony in which he volunteered the information that he used his flashlight while helping the paramedics cross the barges from the Landing to where Smith was lying because "there was no light whatsoever except the spotlights from the boat." (Petrola Deposition at 44-46.) At the hearing, Kurowsky testified that he sent Petrola to assist the "rescue folks;" it was a "slow process" because they were not used to being on barges.  (Tr. 457.)  Neither the statement by Petrola nor by Kurowsky concerns the adequacy of lighting in the area where the accident took place, i.e., on the deck of Barge 4833.  Therefore, this objection is overruled as irrelevant as to the cause of the accident.

36.   The Special Master found that on the day following the accident when Smith spoke to investigators from a drug and alcohol testing program, Eugene and Pamela Seigert-Miklaucic ("the Miklaucics"), he was lucid and alert despite having been prescribed pain medication. The Special Master further concluded in a footnote that although he recognized morphine is a powerful medication, no expert testimony was introduced "to establish that the dose of morphine

provided to Smith would have necessarily or likely affected his memory, comprehension or ability to understand the potential impact of his statements."  Therefore, the Special Master accepted the evidence provided by the Miklaucics, i.e., that Smith told them "I should not have done what I did;" "I stepped in the wrong spot on the barge;" and "it was all my fault."  (Finding of Fact 36.)

Smith objects to this Finding based on denials by Smith and by Lisa Kerr, his significant other.  He also claims the Special Master erroneously adopted the "calculated" testimony of professed "friends" and "continuing business partners" of Tri-River,[30] rather than that of Kerr and her daughter Keisha whom he regards as "far more qualified to determine his lucidity than the Miklaucics, who had just met him for the first time."  Smith argues the Special Master should have instead accepted his testimony and that of the Kerrs that he was too incoherent to be held to such statements.  He concludes that "the mere existence of a potentially mind-altering substance should be legal grounds to accept the seaman's testimony as to his own incoherency."

First, Keisha Kerr did not testify with regard to Smith's lucidity on the night of or day following the accident.  (*See* Tr. 906-926.)  Lisa Kerr testified only peripherally about Smith's consciousness or coherency, stating that she could not determine the longest period he was awake, "he would just be in and out [of sleep].  And he was in so much pain, he had a morphine drip."  (Tr. 936.)  She could hear his telephone conversations with others, and stated "he wasn't too coherent" on the day after the accident.  (Tr. 933.)  Smith testified he remembered the Miklaucics being in his hospital room, but could not remember the conversation with them because he was "falling asleep and going in and out of consciousness."  (Tr. 652.)  Smith does not deny he made the statements cited by the Miklaucics, only that he cannot remember the conversation.  Thus the Finding of Fact, contrary to Smith's argument, was not contradicted by Smith and the Kerrs.

---

[30] Ms. Miklaucic testified that she would consider two Tri-River officers as professional friends with whom she and her company, Spectrum Medical Services, had a good working relationship.  (Tr. 994-995.)  Eugene Miklaucic testified that like Tri-River, Mon River Towing contracted with Spectrum Medical to manage federal drug and alcohol testing programs.  (Tr. 1021-1022.)

Both Miklaucics testified that as an initial step in their testing procedure, they must determine if the subject is lucid, coherent, and capable of understanding the purpose of the test. They further testified that when they visited Smith at approximately 5:00 p.m. on the day following the accident, he was surprisingly lucid and spoke with them freely and coherently about what had occurred.  (Tr. 967, 970-972, 976-981, 1026-1028, 1031-1035, 1051-1052.)

Smith does not point to and the Court cannot independently identify any other testimony or evidence which would support his position that he was so incoherent at the time of the interview with the Miklaucics that his statements cannot be accepted by the Special Master and this Court.

37.  Finding of Fact 37 refers to a statement Smith gave to Watts on January 23, 2003, in which he purportedly stated "I caught line on port side of barges to flop barge and square upstream into fleet . . . with barge slightly angled out in river at stern and boat driving down, I noticed my right foot was in a coil of line I was using when the line became taunt [sic]."  Smith argues that no reasonable trier of fact could have found that when Smith gave the statement he was in full possession of his faculties at the time he signed it, based on (1) his testimony that he did not know the meaning of the word "taut," and (2) his shaky and abnormal signature, reflecting the fact that he was under medication at the time he signed the statement.[31]  He also argues the "clear implication at trial was that [Mon River's] executive might have inserted the word [taut]– and potentially more words – for Smith."

The Finding of Fact is an accurate quotation from the accident report prepared by Watts. Watts testified at his deposition that when he met with Smith to take his statement, he appeared

---

[31]  Smith further objects to the phrase in the statement that he allegedly told Watts he "caught line on port side of barges," arguing again that the evidence showed he did not finish catching a line or he would not have been injured.  This argument has been discussed above and will not be revisited here. Smith also argues that the Finding states he did not properly coil his line and thus contributed to his own injury.  This argument is entirely misplaced because no such Finding was made by the Special Master who simply quoted from the statement offered by Smith to Watts, as recorded by Watts.  *See also* Smith's objection to Finding of Fact 47 below.

coherent, did not seem tired, groggy or under the influence of drugs, and had no reluctance in talking with him.  (Watts Deposition at 86-88, 93.)  According to Watts, the process of writing the statement consisted of Smith dictating a few sentences, Watts reading them back, and Smith confirming that Watts had accurately transcribed his statements.  (Id. at 92-93.)  When the draft was complete, Watts read the statement aloud, then Smith read it himself.  (Id. at 91-92.)  The argument that the Special Master improperly found Smith to be coherent and rational at the time he signed it is outside the scope of the Finding since there is no mention of such conditions therein.  Finally, the argument that Watts "inserted words" for Smith is speculation since there is no evidence from which to infer that Watts improperly changed Smith's statement, particularly since the statement is entirely consistent with those Smith's made to Becker immediately after the accident and to the Miklaucics less than twenty-four hours before.

39.  Finding of Fact 39 states simply, "Barge cleaning operations are conducted at Dravosburg only during daylight hours."[32]  Smith argues that all barge movement at the Dravosburg Landing – including the movement of barges at night – is to facilitate cargo transfer and thus is an integral component of all cargo transfer that occurs there.  He claims by ignoring this fact, the Special Master went beyond a reasonable interpretation of the evidence and thus the Finding is clearly erroneous.  In response to Ingram's contention that the objection is irrelevant (Ingram Barge Company's Response to Mark Allen Smith and Mon River Towing Inc's Amended Objections to Report and Recommendations, Doc. No. 228, at 10), Smith argues it is relevant "because it affects application of law to the Dravosburg repair fleet."  He argues that Ingram has tried to eliminate the most dangerous part of barge work, i.e., the repeated movement of tows, by making it occur at a different time from the rest of its operations in an effort to minimize risk to Ingram "while increasing

---

[32]  Finding of Fact 38, to which Smith and Mon River do not object, describes barge cleaning as removing coal residue from empty hopper barges and inspecting and replacing rigging and other equipment on the barges.

risk of their employees."[33]

The Court finds this argument incomprehensible.  There was testimony that barge cleaning and repair operations were conducted only during daylight hours at Dravosburg (*see*, e.g., testimony by Craig Meehleib ("Meehleib"), the on-site manager of Dravosburg Landing, that Ingram employees worked from 7:00 a.m to 3:30 p.m., Tr. 44 and 46) and Smith points to no evidence which would support a different conclusion.[34]  The remaining arguments are pure speculation; that is, the Court is unable to identify any evidence or testimony to support the conclusion that moving tows is the most dangerous part of barge work, nor is the Court able to find evidence that Ingram tried to minimize risk to itself by separating movement of barges from the cleaning and repair functions.  How Ingram minimizes risk to itself while increasing the risk to its employees is equally incomprehensible, particularly since Smith is not an Ingram employee.  The objection is overruled.

41.  Finding of Fact 41 states that in January 2003, there were no Ingram personnel on site at Dravosburg Landing after 3:00 p.m. when cleaning operations ceased.  Smith's objection to this Finding is discussed above with his objections to Finding of Fact 39.

42.  The Special Master found that the *Rose G.* "essentially had control of the Dravosburg Landing during nighttime hours and lighting for deckhands was provided by the towboat's two searchlights which illuminated an area of approximately four barge lengths," i.e., 700 to 800 feet.  (Finding of Fact 42.)  Smith argues that the crew of the *Rose G.* did not have control of the Landing, particularly access to a locked building which contained additional ropes, lines and electrical cords which would have allowed lights to be moved further out into the fleet.

---

[33]  Smith also argues that there was no evidence about whether his line was coiled properly or improperly and that the Special Master used "contributory liability" against him in this case.  The first point is entirely outside the scope of the Finding and without further analysis by Smith, the Court declines to try to interpret the second.

[34]  The excerpt from Darst's testimony on which Smith relies for this portion of his argument is simply an acknowledgment that fleeting operations, i.e., setting up barges to be cleaned out or removing barges that have been cleaned, occurs 24 hours a day at Dravosburg Landing.  (*See* Tr. 1415-1416.) Jamison conceded no "cleaning or transfer of debris," i.e., coal residue, occurred at night.  (Tr. 225.)

Kurowsky testified he received daily directions from Ingram identifying the barges to be moved from one location to another.  (Tr. 431-432, 476.)  During both day and night, he and the crew of the *Rose G.* determined how to do the fleeting maneuvers, which barges to pick up, and where to place them in the fleet.  (Tr. 475-479.)  There was no evidence that Smith needed additional rope or line any time on the night his accident occurred; in fact, he testified that there was nothing wrong with the line he was using at the time.  (Tr. 727-728.)  Moreover, the objection that lines were unavailable is not only outside the scope of the Finding of Fact, it is contradicted by Meehleib's testimony that if additional leaving lines were needed by the *Rose G.* crew, they would ask him and he would give them a coil (Tr. 1067) and by Kurowsky's testimony that the *Rose G.* had storage space for extra lines  (Tr. 480.)  While it is true both Smith and Kurowsky testified at the hearing that they had complained to Ingram management about the lack of adequate light (Tr. 434-437, 647-649), these statements contradicted earlier testimony during their depositions (*see* Tr. 484) and by the fact that in their statements immediately after the accident, neither of them mentioned inadequate lighting as a cause of the accident.  Finally, it was the usual practice in the industry for towboats to provide lighting of work areas for their crews.  (Tr. 73, 234-236; Deposition of Richard Ehringer, Mon River Towing operations manager, at 42-46; Deposition of James Guttman, Mon River Towing president, at 21-22.)  The Special Master's Finding of Fact is based on substantial evidence and Smith's objection is therefore overruled.

43.  The Special Master stated that Becker and Smith each  had a flashlight he could use to illuminate areas while walking around the barges at night.  (Finding of Fact 43.)  Smith argues that this Finding ignores the fact that Smith's work required him to use two hands, at which point his flashlight was useless.  The Court agrees, but that does not mean the Finding of Fact is erroneous.  On the other hand, the Court does not agree that the evidence showed "Smith was in virtual darkness at the time of the injury" as he contends.  The *Rose G.* was well-equipped with two 1000-watt spotlights and four 500-watt worklights for night-time work, as was the general

practice on the river.  (*See* Finding of Fact 42.)  According to Kurowsky, the lights could shine out into the barge fleet some 3 or 4 barge lengths, that is between 600 and 800 feet, whereas Smith was working at the end of a single barge faced up to the *Rose G.*, i.e., only about 200 feet ahead of the boat .  (Tr. 486, 524.)  Becker testified he had sufficient light for his activities that night. (Becker Deposition at 119.)  While it is true Smith testified he could not use his flashlight while untying lines, he apparently had sufficient light to see well enough to throw a loop of line around a timberhead on Barge 13613, some five feet away.  (Tr. 735.)  Smith's objection is overruled.

44.  In Finding of Fact 44, the Special Master concluded that although Ingram does handle some cargo "as a byproduct of its barge cleaning operations," OSHA and U.S. Coast Guard lighting standards are not applicable because these operations are not performed after sunset while the standards, on their face, apply only to nighttime cargo handling operations.  The Special Master further noted that even if 29 C.F.R. § 1918.92 were applicable to the operations at Dravosburg,[35] there was insufficient evidence to establish that the lighting provided by the spotlights on the *Rose G.* did not satisfy that regulation.  Smith states his objections here are the same as those to Finding of Fact 39, and that a reasonable interpretation of data in the previous Finding would lead to a determination that as a matter of law, Ingram could and should have provided better lighting for the crew of the *Rose G.*

First, there are no "data" in Finding of Fact 39, which simply states that barge cleaning operations are conducted only during daylight hours.  Second, the Court agrees with Ingram that 29 C.F.R. § 1918 pertains to working conditions for longshoremen and there was no evidence that Smith was a longshoreman; in fact, he repeatedly asserts he was a Jones Act seaman.  Third, no matter how broadly one reads the regulation in question, one cannot not reasonably conclude that

---

[35]  The Special Master also found Coast Guard regulation 33 C.F.R. § 154.570 was not applicable; Smith does not object to this Finding.  That regulation pertains to transfer of oil or hazardous material in bulk which is transferred between sunset and sunrise, clearly inapplicable to the facts herein.

Smith was involved in "cargo transfer operations," the portion of the regulation which triggers the requirement that light intensity be a minimum of five foot-candles.  According to the comments to the regulation on which Smith relies, this regulation "provides illumination requirements for cargo handling work aboard vessels" and Smith was never involved in handling the coal residue he contends was cargo.  Similarly, the comment regarding "alternating" light relied upon by Smith actually states, "Alternate areas of extreme luminance differences are undesirable because it tires the eyes to adjust to them."  Even if the Court were to find that these comments in the Federal Register of June 1994 imposed a duty on Ingram (which the Court explicitly does not find), as far as can be determined from the evidence, Smith was not moving from one area to another which involved "extreme luminance differences."  Instead, the evidence shows that he was on Barge 4833 at all times immediately before the accident.[36]  Thus, the Court concludes the Special Master did not err in finding that the OSHA regulations identified by Smith and Mon River were not applicable.

45.  The Special Master found that although Ingram could have provided additional lighting at Dravosburg Landing, it had no legal or statutory duty to do so, given the lack of nighttime operations and the ability of towboats performing fleeting operations to illuminate work areas for the deckhands.  (Finding of Fact 45.)  Smith argues that the illumination provided by the *Rose G.* was insufficient for the place Smith had to work, i.e., on the deck of Barge 4833.  Moreover, Ingram had a duty to provide a safe place to work even in the absence of statutory duties and, inasmuch as Ingram voluntarily undertook to light part of its fleet for security reasons, it should be held negligent for failure to perform such a duty properly for the complete landing area.

---

[36]  The Court is unable to parse Smith's statement that he provided the comment to the OSHA regulation 29 C.F.R. § 1918.92 "which specifically states that the rule applies to motor vessels not to moored barges."  Despite repeated electronic word searches through the entire commentary provided at the website Smith identified, the Court can find no reference to moored barges.

The cases upon which Smith relies[37] are not on point because both arise under the Longshoremen's and Harbor Workers Compensation Act, 33 U.S.C. § 905(b) ("LHWCA"), while Smith has consistently argued that his claims arise under the Jones Act.  Second, even if the LHWCA were applicable, the duties imposed are a duty of ordinary care to maintain the ship and its equipment in such a condition that an expert and experienced stevedore can load and unload cargo with reasonable safety and the related duty to warn the stevedore of latent hazards which are known or should be known to the shipowner.  33 U.S.C. § 905(b).  As an experienced deckhand, Smith knew that (1) there was stationary rigging on the barges which was not always new or perfect, (2) the coamings of barges cast shadows, and (3) most nighttime activities along the river were performed using light originating on the towboat, not from fixtures at the landing.  (Tr. 56, 647, 681.)

Third, Smith and Mon River have failed entirely to establish the elements necessary to show either the applicability or the breach of a duty undertaken pursuant to the Restatement (2d) of Torts §§ 323 and 324A on which they also rely.[38]  The "Good Samaritan Rule" derived from Section 323 "makes one person liable to another for breach of a duty voluntarily assumed by affirmative conduct, even when that assumption of duty is gratuitous."  Good v. Ohio Edison Co., 149 F.3d 413, 420 (6th Cir. 1998), quoting Patentas v. United States, 687 F.2d 707, 713-714 (3d Cir. 1982).

---

[37] See Scindia Steam Navigation Co., Ltd. v. De Los Santos, et al., 451 U.S. 156 (1981) and Howlett v. Birkdale Shipping Co., 512 U.S. 92 (1994).

[38] In full, § 323 of the Second Restatement of Torts provides: "One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking." Section 324A provides: "One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if (a) his failure to exercise reasonable care increases the risk of such harm, or (b) he has undertaken to perform a duty owed by the other to the third person, or (c) the harm is suffered because of reliance of the other or the third person upon the undertaking."  Restatement (2d) of Torts § 324A.

Under this doctrine, liability may be established if Smith and Mon River show that Ingram's negligence increased the risk of harm, i.e., that Ingram's "affirmative actions caused some physical change to the environment or some other material alteration of circumstances." Good, 149 F.3d at 421 (citations and internal quotation marks omitted).  "The test is not whether the risk was increased over what it would have been if the defendant had not been negligent, but rather whether the risk was increased over what it would have been had the defendant not engaged in the undertaking at all." Id. (internal quotations and citations omitted.)  Here, Ingram undertook to light certain areas of the Dravosburg Landing for security reasons, particularly at the head of the cleaning/repair fleet and the hull area, areas which were not typically used by the *Rose G.* and its crew.  (Tr. 48, 54-55.)  Smith fails entirely to explain how the risk of harm to him was increased by providing lighting in one area but not another, particularly one in which he did not work.  If Ingram had undertaken gratuitously to provide lighting for all nighttime activities at the Landing but failed to do so adequately, Smith might have a valid argument that the torts principles to which he cites are applicable, but such is not the case here.

46.    Finding of Fact 46 states the Special Master's conclusion that inadequate lighting at the Dravosburg Landing was not a substantial contributing cause of Smith's accident and injuries.  Smith argues that because he testified he could not see where he was standing due to shadows thrown by the coaming of Barge 4833 and no other witness disputed this material fact, his theory of how the accident occurred must therefore be accepted.  This argument is not persuasive.  Since in Smith's version of events, the accident occurred not because he stepped into the bight of the line he had dropped on the barge deck, but rather because the line whipped around his right leg as he jerked it free from the stationary rigging, it is irrelevant if he could see where he placed his feet just before the accident occurred.  That is, in his scenario, his feet were planted *before* the line wrapped itself around his leg.  (Tr. 735, 743-744.)  Moreover, Smith testified he was able to see the stationary rigging in which his line allegedly became entangled.  (Tr. 708-709, 722.)

Therefore, even under Smith's version of events, the lack of lighting played no role in his accident and his objection is overruled.

47.   Finding of Fact 47 recognizes that there was adequate light to catch a line between the two barges and even if the area around his feet was obscured by the shadow cast by the coaming of Barge 4833, a properly coiled line would have prevented Smith from stepping into a loop of the line.  (*See* Tr. 1386-1387, 1393.)  Smith argues that because no other witness could see his legs and feet, there is no evidence to show that he stepped into the loop of the line.  This argument is completely unavailing in light of the statements he made to Becker and the Miklaucics when he told them that was exactly what he had done and to Watts when he stated that while catching the line, he noticed that his right foot was in a coil of line he was using.  (*See also* Tr. 974-975, 979, 1031-1033.  )  Thus, contrary to Smith's argument that the Finding is based on evidence which does not exist, at least three witnesses reported statements in which Smith himself contradicted the testimony he gave at the hearing.

48.   Smith's objections to Finding of Fact 48 that there was "simply insufficient credible evidence to establish that inadequate lighting was a contributing cause of Smith's injuries" are the same as discussed in the objections to the two preceding Findings and will not be reconsidered.

49.   The Special Master noted Smith's testimony that his leg had become wrapped in the line he jerked free from what he assumed to be wires on the barge.  The Master found that "Smith's version of how his leg became entangled in the leaving line is not credible."  Consequently, he concluded in Finding of Fact 49 that although pictures of Barge 4833 taken the morning of January 22, 2003,[39] showed some wires which were not lying flat on the deck, there was insufficient evidence to support a finding that they played any part in the accident.  Smith argues no evidence

---

[39]  These photos were actually taken by Richard Davis on the morning of January 24, 2003, not January 22.  *See* Ingram Exhibit HH.

or testimony contradicted his statement of how the line became entangled, rather, the only question was about what the line became entangled in.[40]

The Court notes that Smith's descriptions of how his accident occurred have changed significantly over time.  For example, immediately after the accident, he admitted (or at least implied) to four people that he stepped into the bight of the line he was using to tie the barges together.  (*See* discussion of Finding of Fact 36 above.)  In his claims filed in the limitation of liability cases, Smith alleged that his leg (or alternatively, the line he was using) became entangled in junk lines left on Barge 4833, throwing him into the water.  He stated at his deposition on May 14, 2004, that he did not see the line he was using become caught in wire or rigging on the barge, only that the line somehow became tangled around his ankle.  (Smith Deposition at 181-185.)  At the evidentiary hearing, he testified that after he had placed the eye of the line on a timberhead on Barge 4833 and a loop of line over a timberhead on Barge 13613, he was  standing with his feet "a couple feet" apart, preparing to take more wraps on the Barge 4833 timberhead.  At that point, his line became tangled in wire rigging on the barge deck and, when he attempted to pull the line free, the end of it whipped around his right leg several times "like a slingshot," so tightly he could not unwrap it before he was pulled overboard.  (Tr. 735-738, 746-747.)

The Court has reviewed Smith's testimony and, like the Special Master, finds it not only incredible, but contrary to the general laws of physics.  Surely, had something so remarkable occurred, i.e., the line whipping between his legs several times in such a way as to catch his right but not his left leg, Smith would have reported it to someone immediately upon regaining his ability to communicate.  Moreover, if the wires on the forward deck of Barge 4833 were not lying flat, there was evidence from which to conclude that either Smith or Becker had been the last to handle those wires when they uncoupled Barge 4833 from Barge 2008 in preparation for moving it downriver and

---

[40] Smith also repeats his arguments made with regard to Findings of Fact 36 and 37 which have been addressed above.

was responsible to see that the wires were coiled properly on the deck.  (Tr. 573-574.)  Kurowsky testified that no deckhands who used the wires at the front port corner of Barge 4833 earlier that day, including Smith and Becker, had complained about their condition.  (Tr. 491-492.)  Finally, Richard Davis ("Davis"), Ingram's marine surveyor who inspected the barges on January 24, 2003, did not see wires that were "kinked, coiled, [or] wrapped up like a spring on a car" as Smith described them.  (Tr. 615, 865.)  It is important to note that his report was prepared on February 13, 2003, long before Ingram was aware of Smith's allegations regarding the cause of his injuries.[41] The Court has also reviewed the photographs of Barge 4833 in question (Ingram Exhibit HH) and agrees with the Special Master's conclusion that it is unlikely any of them played a part in Smith's accident.

In sum, having reviewed the hearing transcript, the evidence of the parties, the Special Master's Findings of Fact and Smith's and Mon River's arguments in support of their objections thereto, the Court is convinced that the Findings of Fact are based on substantial evidence and that the Special Master did not err in those Findings.  The objections of Smith and Mon River to those Findings are therefore overruled in their entirety.

B.      Objections to Conclusions of Law

Smith objects to nine of the Special Master's 28 Conclusions of Law.  As with his objections to the Findings of Fact, the Court finds none of these objections have merit.

4.  Smith's objection to Conclusion of Law 4, i.e., that Smith failed to establish his status as a Jones Act seaman vis-a-vis Ingram or Tri-River, is discussed above in Section III.A and will not be reiterated here.

10.  In Conclusion of Law 10, the Special Master found Smith had failed to offer sufficient evidence to establish that Barge 4833 was unseaworthy at the time of the accident.

---

[41]  In his claim in CA No. 03-163, filed on March 10, 2003, Smith alleged his leg, not his line, became caught in a marine junk line left aboard Barge 4833.  (Doc. No. 10, ¶ 4.)

Smith contends he introduced evidence that the rigging on Barge 4833 was "so tangled and strewn about the deck" that it snagged his line which subsequently entangled his leg.  Citing Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 550 (1960), and Vargas v. McNamara, 608 F.2d 15, 18 (1st Cir. 1979), Smith argues he has established the unseaworthiness of Barge 4833 because improperly kept rigging aboard a vessel renders it unseaworthy.[42]

A vessel and its appurtenances are considered seaworthy if they are  "reasonably fit for their intended use," a standard which does not require perfection.  Mitchell, 362 U.S. at 550. Assuming for the sake of argument that the Court accepts Smith's version of how the accident occurred and his line became tangled in the "improperly kept" stationary rigging of the barge, that entanglement does not lead necessarily to the conclusion that the rigging was not reasonably fit for its intended use.  The stationary rigging on the barges was intended to securely fasten one barge to another.  (Tr. 860-861.)  Nothing in the record indicates the rigging was not fit for this purpose, e.g., it did not snap unexpectedly or violently, thereby causing Smith's injury.  As noted above, Kurowsky testified he had received no complaints about the rigging on Barge 4833, either that day or in the recent past.  (Tr. 491-492.)  He also testified, and Meehleib confirmed, that if there were a problem with rigging on a barge, he informed Ingram and it was replaced.  (Tr. 437, 75-76.)  Second, Smith's argument focuses not on the condition of the rigging for its intended use,

_____

[42]  The Court notes for the record that neither of the cases cited by Smith refers in any way to the rule he states in his objections.  Mitchell addressed, primarily, the question of whether a vessel may be considered unseaworthy if a transitory condition not of the shipowner's making and unknown to the shipowner causes an injury.  In that case, the temporary condition was fish slime and gurry on a ship's railing which accumulated during unloading operations at the completion of the voyage.  The Court concluded that the duty to provide a seaworthy vessel was absolute, but included the caveat that seaworthy did not mean accident-free, but rather reasonably fit for its intended purpose.  Id., 362 U.S. at 550.  Vargas is a bit closer to the point since the court remanded the case for consideration of whether the shipowner had required his employees to use an unsafe method to clean the engine room and/or failed to provide adequate equipment for the performance of the task, either of which might fall under the vessel's obligation to furnish seamen with tools reasonably fit for their intended use.  Id., 608 F.2d at 19.  However, neither of those cases concerns improperly kept rigging.  In his reply memorandum, Smith argues that these cases stand for the proposition that a shipowner's failure to provide adequate equipment is evidence of unseaworthiness.  (Doc. No. 251 at 20.)  As discussed above, there was no evidence that the stationary rigging was in as poor condition as Smith contends and thus unfit for its intended use.

but his contention it was so "tangled and strewn around the deck" that it entangled his line.  When this allegation is coupled with the fact that both Meehleib and Kurowsky agreed that the *Rose G.* crew decided how to manage the lines and rigging (Tr. 67, 75, 477), and the evidence pointing to the fact that Smith or Becker was the last to handle the rigging as they uncoupled Barge 4833 in preparation for moving it downriver, one can reasonably conclude that the cause of Smith's accident (as he relates it) was not caused by unseaworthy rigging, but because the rigging was not properly handled by Smith or another *Rose G.* crew member.

11.  Conclusion of Law 11 simply defines "seaworthy," a point the Court has addressed in the preceding section.  Again citing <u>Mitchell</u> and <u>Vargas</u>, Smith argues this conclusion does not cite the entirety of applicable law, i.e., that a vessel's rigging must be fit for its intended purpose.  Those cases have been addressed above and in note 42 and will not be revisited.

12.  Conclusion of Law 12 states the evidence failed to support a finding that Barge 4833 was not reasonably fit for its intended purpose at the time of Smith's accident. Smith argues that the junk lines on Barge 4833 were clearly unfit for their intended use.

Kurowsky testified that after Smith had been rescued, he noticed the rigging near where Smith had been standing just before he went overboard was not properly coiled and tied down. (Tr. 459-460.)  Smith testified there were wires on the corner of Barge 4833 which were "twisted really bad.  They needed replaced. . . it reminded me of like a coil spring of a car." (Tr. 650.)  He further testified it was impossible to neatly coil such a badly twisted and kinked wire because it would "spring back to the original form" it had when he found it on the deck.  (Tr. 819.)

The photographs taken by Davis on January 24, 2003, include photos of the stationary rigging at the port bow corner of Barge 4833.  (Ingram Exhibit HH-3 and -4.)  The rigging is lying flat on the deck with a single twist in it.  (*See also* testimony at Tr. 870-871.)  Becker testified he had not noticed any particular problem with the rigging except a wire connected to the port timberhead.  (Becker Deposition at 84-85.)  Meehleib testified he saw no excess, bad or kinked

49

rigging on the barge when he inspected it after the accident and that no one from the *Rose G.* or Mon River reported a problem with its rigging.  (Tr. 69, 74, 1072-1073.)  Significantly, Smith did not testify that he had attempted to coil this line properly but was unable to do so because of its condition.  Having reviewed the photographs and the testimony about the stationary rigging in which Smith contends his line became entangled, the Court concludes the Special Master did not err in finding the rigging was reasonably fit for its intended purpose and consequently, that Barge 4833 was seaworthy at the time of the accident.

14.  With regard to the general maritime negligence claim against Tri-River, the Special Master found  that Tri-River did not breach its duty to exercise reasonable care under the circumstances when the *Bill Dyer* passed the *Rose G.* after being instructed by Kurowsky to do so at its discretion.  (Conclusion of Law 14.)  Smith argues this conclusion assumes facts not in evidence, based on his objections to Finding of Fact 27 discussed above.  He reiterates his argument that because the *Bill Dyer's* radio was inoperable, Fey could not have heard, and therefore could not have relied on, Kurowsky's direction to proceed.  This lack of an operable radio – together with the lack of working lights – on the *Bill Dyer* clearly put Smith in danger.  In short, he argues the *Bill Dyer* was in such poor condition that Fey could not have operated it safely whatever he did.  This portion of his argument is quickly dismissed as outside the scope of the Conclusion which relates only to question of whether the *Bill Dyer* was negligent in passing the *Rose G.*, not its seaworthiness.

Citing 47 C.F.R. §§ 80.880 and 80.309, and 33 C.F.R. §§ 26.03 and 84.01 *et seq.*,[43] Smith's

---

[43]  The statutes and regulations to which Smith refers may or may not be applicable to the facts herein.  For example, 47 C.F.R. § 80.880 is a Federal Communications Commission regulation which applies to vessels of 300 gross tons or more; no facts appear to be in evidence which would make this regulation applicable to the *Bill Dyer*.  (*See* Tri-River Exhibit S in which it is stated that the *Bill Dyer* had a gross tonnage of 188 tons.)  Similarly, § 80.309 applies to vessels subject to the "Bridge to Bridge Act."  While it may apply to the *Bill Dyer*, there is nothing in evidence to support such a conclusion.  The radiotelephone requirement of 33 C.F.R. § 26.03 would seem to apply inasmuch as the *Bill Dyer* most likely is a "towing vessel of 26 feet or over in length" (*See* Tri-River Exhibit S, indicating that the *Bill Dyer* was 94.1 feet long) and was navigating at the time in question, but there was conflicting evidence on the

second objection is that the *Bill Dyer* had a statutory duty to maintain the lights and a radio watch over the designated navigational frequency.  Moreover, the vessel had a duty to follow the inland navigation rules; its breach of this duty was made clear in Fey's testimony, bolstered by Kurowsky, Jamison, Darst and Smith.  He argues that the Conclusion as stated by the Special Master fails to discuss whether the employment of an "admittedly untrained crew" on the *Bill Dyer* constituted negligence on the part of Tri-River.  Smith notes that he "specifically alleged" this lack of an untrained crew. [44]

Under general federal maritime law, negligence is an actionable wrong.  Galentine v. Estate of Stekervetz, 273 F. Supp.2d 538, 544 (D. Del. 2003), citing Leathers v. Blessing, 105 U.S. 626 (1882).  "In order to prevail on a claim of maritime negligence, a plaintiff must prove that there was: 1) a duty of care which obliges the person to conform to a certain standard of conduct; 2) a breach of that duty; 3) a reasonably close causal connection between the offending conduct and the resulting injury; and 4) actual loss, injury, or damages suffered by the plaintiff."  Galentine, id., *citing*

---

question of whether the vessel's radios were operational.  The last regulations cited, 33 C.F.R. §§ 84.01 *et seq.*, cover a number of requirements for positions and technical details of lights.  The Court cannot discern from Smith's arguments which of these regulations he believes apply to and were violated by the *Bill Dyer*.

[44]  Again, the Court is unable to discern the purpose of the cases cited by Smith in this objection.  In Boudoin v. Lykes Bros. S.S.Co., 348 U.S. 336, 340 (1955), the Court concluded that a vessel can be considered unseaworthy based on the actions of its crew, i.e., a drunken attack by a crew member described as "a person of violent character, belligerent disposition, excessive drinking habits, disposed to fighting and making threats and assaults," in part because such a crew "was not competent to meet the contingencies of the voyage."  While Brogan v. United N.Y. Sandy Hook Pilots' Ass'n., 213 F. Supp.2d 432, 438 (D. N.J. 2002), does address negligence and unseaworthiness, the court there concluded that other than the single instance in which the plaintiff was injured, Brogan had failed to proffer sufficient evidence from which to conclude the crew was so improperly trained that the vessel on which they were working could be deemed unseaworthy.  Maurello v. United States, 111 F. Supp.2d 475, 483 (D. N.J. 2000), is a Federal Torts Claim Act case brought against the United States Bureau of Prisons for false imprisonment and the tort of negligence *per se* under Pennsylvania law.  Standard Dredging Corp. v. S.S. Syra, 290 F.Supp. 260, 263-265 (D. Md. 1968) involved an allision between a ship and a pipeline dredge in which the court found the ship negligent for failing to properly ascertain its position, failing to use radar, failing to use the correct passing whistle signals, failing to maintain a bow lookout, and failing to remain informed of printed notices to mariners, none of which is applicable to the facts herein.  Karle v. National Fuel Gas Distribution Corp., 448 F.Supp. 753, 767 (W.D. Pa. 1978) is another Pennsylvania negligence *per se* case with no apparent applicability to maritime law.

1 Thomas Schoenbaum, Admiralty and Maritime Law § 5-2 at 170 (3d ed. 2001); *see also* <u>VA Int'l</u> <u>Terminals, Inc. v. M/V Katsuragi</u>, 263 F. Supp.2d 1025, 1035 (E.D. Va. 2003), and <u>Canal Barge</u>, 220 F.3d at 376 (same).  Causation in maritime law, as in general tort law, requires the party alleging negligence to demonstrate both factual and proximate causation.  <u>Galentine</u>, 273 F. Supp.2d at 548.  "Factual causation involves an inquiry into whether the event would have occurred in the absence of an act or omission.  Proximate causation involves an inquiry into whether the damage was a reasonably foreseeable consequence."  <u>Galentine</u>, <u>id.</u> (internal citation omitted). The negligence must be a "substantial factor" in causing the injury, defined as "something more than 'but for' causation."  <u>Thomas v. Express Boat Co.</u>, 739 F.2d 444, 448 (5th Cir. 1985).

The alleged negligence of the Bill Dyer navigating without proper lights and without an operable radio has been discussed at length above.  The Court agrees with the Special Master that conflicting evidence was presented on both these subjects and, having reviewed the entire record, the Court finds no reason to disagree with the Special Master's findings on these issues.

Smith does not take issue with Kurowsky's testimony that he indeed told the *Bill Dyer* to pass at its discretion.  The question, then, is whether that passing was done negligently, e.g., too close to the *Rose G.* or in such a way that hydraulic displacement caused an undue or unanticipated movement of the towboat and the barge on which Smith was standing.  This issue has been exhaustively reviewed in Finding of Fact 27 above.  The only remaining new issue, therefore, is whether the crew of the *Bill Dyer*, specifically Fey, was inadequately trained.

The Court has reviewed both Smith's complaint against Tri-River and his claims in the exoneration/limitation of liability suit brought by Tri-River.  Neither of them "specifically" alleges – or even alleges by implication – that the Tri-River entities were negligent for failing to adequately train the crew of the *Bill Dyer*.  Jamison testified that in his expert opinion, Fey was inadequately trained because the *Bill Dyer* "did not assess the situation and stop," as he approached the *Rose G.*  He also opined that Fey "definitely wasn't on top of the rules of the road or just generally

everyday policies on navigating up and down the Mon River" and in particular violated Rule 13, the overtaking rule.  (Tr. 174-178.)  John Fedkoe, Tri-River's vice president of operations, testified that although Fey was "a very hard man to get along with," he was "a very skilled pilot" who had a current pilot's license and had passed a pre-employment drug and alcohol test.  (Tr. 1118-1120.) Again, the Special Master's decision revolves around credibility and the Court finds Smith's arguments regarding Fey's inadequate training are not well taken.  The Court therefore affirms the Special Master's conclusion that Smith's injuries were not proximately caused by any negligence on the part of the *Bill Dyer*.

    15.   The Special Master found Ingram was not liable to Smith on any theory of general maritime negligence because Smith failed to establish that Ingram breached its duty to exercise reasonable care under the circumstances.  (Conclusion of Law 15.)  Smith argues Ingram breached three duties: a statutory duty to provide adequate lighting (an issue which has already been addressed at length above), to provide a safe work place, i.e., a barge deck clear of obstacles such as tangled rigging, and to provide adequately trained staff.  Breach of these duties caused Smith's injury, as shown by the testimony of Kurowsky, Smith, Petrola, and Meehleib.

    Smith's citations to the law are once more less than persuasive.[45]  While The *Seeandbee*,

---

[45]  *See* Chao v. Mallard Bay Drilling, Inc., 534 U.S. 235 (2002), cited for the proposition that Ingram had a statutory duty to provide lighting, has nothing to do with lighting but instead addresses the question of whether OSHA had the authority to cite the defendant for violations of safety standards on an inland oil drilling barge which would otherwise have been under the regulatory jurisdiction of the U.S. Coast Guard.  OSHA regulation 2232 § 1917.123 applies only to "marine terminals," as defined therein, where cargo or materials are moved from vessel-to-shore and vice-versa.  Even if one were to accept Smith's proposition that removing remnants of coal from barges as they are cleaned out and transferring that small amount to another barge where it is stored and eventually sold, such transfers are not only secondary to the main function of the Dravosburg Landing facility, but involve only transfers from vessel-to-vessel, not vessel-to-shore as provided in the regulation.  Regulation 33 C.F.R. § 126.15(4) does not apply to this case inasmuch as there is no evidence that the Dravosburg Landing was a "designated waterfront facility" at which "dangerous cargo" was transferred.  See 33 C.F.R. § 126.3, defining "designated waterfront facility" and limiting "dangerous cargo" to those materials identified in 49 C.F.R. Pts. 170-179.  Nor does 33 C.F.R. § 154.570 apply because on its face, this regulation applies only to facilities transferring oil or hazardous material in bulk between sunset and sunrise.  Socony-Vacuum Oil Co. v. Smith, 305 U.S. 424 (1939), cited for the proposition that Ingram had a duty to provide a safe place to work, actually focuses on whether the assumption of the risk may be raised by a defendant in a Jones Act injury case, the Court holding that the rule of comparative negligence applied instead when a seaman

102 F.2d 577, 581 (6th Cir. 1939) is somewhat on point, it is inapplicable herein because that case concerned a Jones Act seaman injured on his employer's ship where the court held that the employer had an absolute duty to provide a seaworthy vessel, including the duty to keep in order appliances appurtenant to the ship and to provide a safe place to work.  Here, the Special Master stated that he had concluded Smith was not a Jones Act seaman with regard to Ingram.  (Tr. 10.) Therefore, the duty falling on Ingram was not absolute, but rather the duty to provide reasonable care under the circumstances.  *See* Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625, 632 and n.9 (1959) ("the owner of a ship in navigable waters owes to all who are on board for purposes not inimical to his legitimate interests the duty of exercising reasonable care under the circumstances of each case" as compared to an absolute right to a seaworthy vessel owed to members of the ship's crew.)   "A seaman must show that an unsafe condition on the vessel caused his injury; dispensing with the need to prove that some 'fault' led to this condition does not dispense with the need to establish that there was one."  Hughes v. Conticarriers & Terminals, Inc., 6 F.3d 1195, 1197 (7th Cir. 1993).  As the evidence showed, Ingram replaced damaged rigging as part of its routine barge maintenance and, in addition, when advised by the crew of the harbor boat that rigging needed to be replaced.  Most importantly, Kurowsky and Becker both testified that on the night of the accident, no one had reported the rigging on Barge 4833 was unsafe or in need of replacement.

The four cases cited by Smith for the principle that Ingram had a duty to provide an adequately trained staff[46] are irrelevant because (1) Smith never raised a claim that Ingram's staff was inadequately trained (in fact, no Ingram staff members are identified by name in any of his

---

uses a defective ship's appurtenance knowing that a safer one was available.  Id. at 432.

[46]  *See* Federal Marine Terminals v. Burnside Shipping Co., 394 U.S. 404 (1969); Tomlinson Fleet Corp. v Herbst, 268 F.2d 642 (6th Cir. 1959); Oglebay Norton Co. v. CSX Corp., 788 F.2d 361 (6th Cir.), *cert. denied*, 479 U.S. 849 (1986); and In re Tug Beverly, Inc., CA No. 92-99, 1994 U.S. Dist. LEXIS 6471 (E.D. Pa. May 19, 1994).

memoranda) and (2) the cases on which he relies address the issue of inadequately trained crew or staff only in passing, if at all.

      16.   The Special Master concluded that none of the negligent acts or conditions alleged by Smith, i.e., inadequate lighting at Dravosburg Landing, failure to implement proper safety rules, and a barge which was unseaworthy by virtue of defective rigging, was a proximate or legal cause of Smith's injuries.  (Conclusion of Law 16.)  Smith reiterates his arguments raised in objections to Findings of Fact 39-49 and Conclusions of Law 10-12 and 15.  The Court need not revisit those arguments or its conclusion that in each instance, the Special Master arrived at a correct decision.

      17.   The Special Master found that because neither Ingram nor Tri-River was liable under any of the causes of action asserted by Smith, Mon River cannot, as a matter of law, recover from those parties any of the maintenance and cure payments Mon River made to Smith. (Conclusion of Law 17.)  Mon River objects to this conclusion based vaguely "on all of Smith's objections presented above."

      The Court has reviewed the suit for limitation of liability brought by Tri-River and finds no claim for indemnification or contribution filed therein by Mon River.  Therefore, it never was entitled to such relief under any circumstances.  Secondly, although in this instance, the cases cited by Mon River are somewhat more on point in that they address the issue decided by the Special Master, both depend on an underlying conclusion that the owner of the vessel was at least partly responsible for the injury suffered by the non-employee seaman.  *See* Savoie v. LaFourche Boat Rentals, Inc., 627 F.2d 722, 627-628 (5th Cir. 1980), concluding that where a seaman is injured by a third party and receives maintenance and cure payments from his employer under the special duty to make such payments regardless of the employer's fault, the otherwise innocent employer is entitled to indemnification from the negligent third party; *also* Adams v. Texaco, Inc., 640 F.2d 618, 621 (5th Cir. 1981), in which the court held that when a seaman was injured as a result of a

55

partially negligent shipowner, a partially negligent employer, and his own contributory negligence, in accord with the general principle in admiralty requiring contribution between those jointly at fault or jointly responsible, the "party whose neglect has in part contributed to the need for maintenance and cure payments . . . should reimburse the costs of those payments to the extent occasioned by its fault."

As discussed above, the Special Master found that Ingram was entirely without fault. Therefore, even if the Court were to adopt the reasoning of <u>Savoie</u> and <u>Adams</u>, the rules promulgated in those cases are irrelevant.  Mon River's objections to this Conclusion of Law are overruled.

18.   Based on their previous objections discussed above, Smith and Mon River object to Conclusion of Law 18, i.e., that Ingram and Tri-River are exonerated from liability inasmuch as Smith and Mon River failed to establish negligence on the part of either of those entities and/or failed to establish that the conduct or conditions attributed to Ingram or Tri-River were a proximate cause of Smith's accident and injuries.  Without additional argument or legal citation by Smith or Mon River to support these objections, the Court finds them without merit and they are therefore overruled.

Based on its review of the hearing transcript, other evidence, arguments of the parties and the relevant law, the Court concludes the Special Master did not err in his Conclusions of Law to which Smith and Mon River object.  Those objections must therefore be overruled.

## VI.    INGRAM'S OBJECTIONS TO THE SPECIAL MASTER'S CONCLUSIONS OF LAW

Ingram focuses its objections to the Special Master's Conclusions of Law on those related to its demand for indemnity by Mon River. In this portion of his Report and Recommendations, the Special Master first summarized the "<u>Ryan</u> doctrine," the judicially-created implied warranty of workmanlike performance given by contractors to shipowners in a variety of maritime contractual relationships, including towing agreements.  <i>See</i> <u>Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp.</u>,

350 U.S. 124 (1956).[47]  (Conclusions of Law 19-20.)  The Special Master concluded that the implied warranty of workmanlike performance applied to the relationship between Mon River and Ingram, i.e., Mon River's harbor boat, the *Rose G.*, and its crew provided unsupervised services at the Dravosburg Landing, primarily movement of Ingram's barges.   The Special Master further concluded that Ingram had a valid indemnity claim against Mon River, even though Ingram did not incur any liability in this matter.  (Id., ¶¶ 21-22.)  He specifically cited Cooper v. Loper, 923 F.2d 1045, 1051 (3d Cir. 1991), in which the United States Court of Appeals for the Third Circuit authorized payment of attorneys' fees incurred by the shipowner as well as the award of indemnity for damages.  This case is distinguishable, according to the Special Master, because Ingram did not incur any liability, let alone liability without fault.  (Id., ¶¶ 23-25.)  Because the only amounts Ingram could potentially recover for breach of the implied warranty of workmanlike performance are the litigation expenses it incurred in defending against Smith's claim and because Mon River had no control over Smith's right to assert non-frivolous claims against Ingram for general maritime negligence and/or unseaworthiness, the Special Master concluded Ingram is not entitled under the Ryan doctrine to recover its litigation expenses and attorneys' fees incurred in defending against Smith's claims.  (Id., ¶¶ 26-27.)

Ingram argues that the Special Master erred in this determination concluding that despite the validity of its indemnity claim against Mon River, Ingram was not entitled to recover its litigation expenses, attorneys' fees and costs.  (Memorandum of Law in Support of Objections to and Motion to Reject/Modify in Part the Special Master's Report and Recommended Findings of Fact and Conclusions of Law, Doc. No. 214, "Ingram Memo," at 2.)   Ingram raises two primary arguments with regard to the purported errors.  First, the Special Master misapplied  controlling Third Circuit

---

[47] The facts presented in Ryan and the Supreme Court's reasoning for its holding are discussed at length in In re: J.A.R. Barge Lines, CA No. 03-163, 2005 U.S. Dist. LEXIS 22578 (W.D. Pa. Oct. 5, 2005), and will not be reiterated here.

law by requiring that Ingram be found liable before it could seek indemnification.  (Id. at 2-7.)
Second, the Special Master erred by finding that because Mon River had no control over Smith's
claims against Ingram, Ingram was not entitled to indemnification for defending against those
claims.  (Id. at 7-10.)  The Court agrees that the Special Master erred on both these issues. [48]

The Special Master correctly noted that the implied warranty of workmanlike performance
incorporates three critical elements:

> a shipowner, relying on the expertise of another party (the contractor), enters into
> a contract whereby the contractor agrees to perform services without supervision
> or control by the shipowner; the improper, unsafe or incompetent execution of such
> services would foreseeably render the vessel unseaworthy or bring into play a pre-
> existing unseaworthy condition; and the shipowner would thereby be exposed to
> liability regardless of fault.  Where these elements are present, there will be implied
> in the contract an agreement by the contractor to indemnify the shipowner for any
> liability it might incur as the result of an unseaworthy condition caused or brought
> into play by the improper, unsafe or incompetent performance of the contractor.

Fairmont Ship Corp. v. Chevron International Oil Co., Inc., 511 F.2d 1252, 1258 (2d Cir.), cert.
denied, 423 U.S. 838 (1975).

The purpose of the Ryan doctrine of indemnification is to place "the burden ultimately on
the company whose default caused the injury."  Italia Societa v. Oregon Stevedoring Co., 376 U.S.
315, 324 (1964).  Therefore, the court must weigh the conduct of the contractor and the shipowner
to determine whether the implied warranty of workmanlike performance was breached; if so,
whether that breach proximately caused the injury; and whether the shipowner's conduct is

---

[48]  The arguments of Mon River and Smith in response are for the most part irrelevant in that they
generally reiterate their own objections rather than respond to those raised by Ingram.  They also argue
that the Special Master erred by finding that Ingram had a valid indemnity claim (Conclusion of Law 22),
however, they did not raise an objection to this  conclusion themselves.  Moreover, their argument that the
Ryan implied warranty of workmanlike performance is "disdained" by "most legal scholars,"  was analyzed
in detail and rejected in the Court's Memorandum Opinion of October 5, 2005.  The Court also rejects out
of hand Mon River's argument that it is the shipowner in this action to whom indemnity is owed as the
owner of the Rose G., while Ingram was the contractor who owned and controlled the Dravosburg Landing
and the barges being moved about.  (Mark Allen Smith and Mon River Towing, Inc.'s Memorandum in
Opposition to Ingram Barge Company's Objections to Special Master's Report and Recommendations,
Doc. No. 217, at 3.)  Finally, once again, Smith and Mon River's citations to the law are inadequate or not
on point.  See, e.g., their reliance on Cooper, 923 F.2d at 1050-1051, for the argument that one of the four
critical elements of a Ryan indemnification claim is that the shipowner be held liable without fault.  (Doc.
No. 217 at 2.)  Cooper does not discuss the Ryan elements either at the pages cited or elsewhere.

sufficiently blameworthy to preclude indemnity.  <u>Parfait v. Jahncke Service Inc.</u>, 484 F.2d 296, 302 (5th Cir. 1973).  Generally speaking, the question of whether a contractor breached the warranty of workmanlike performance is a question of fact.  <u>Cia Maritima Del Nervion v. James J. Flanagan Shipping Corp., Stevedore Division</u>, 308 F.2d 120, 123 (5th Cir. 1962).

Here, the first of the three elements is clearly satisfied.  Ingram, relying on the expertise of Mon River, entered into a letter agreement whereby the latter agreed to continue to provide harbor boat services to Ingram at the Dravosburg Landing as of January 13, 2003, at a rate established by Mon River.  (See Ingram Exhibit PP.)  The letter agreement, however, did not include a contractual commitment for Mon River to indemnify Ingram.[49]  The Special Master found that Mon River, through the *Rose G.* and its crew, performed those services without supervision or control by Ingram.  (Findings of Fact 14-16, 42.)

This is also a situation involving "the improper, unsafe or incompetent execution of such services."  A contractor's duty under its warranty includes the duty to provide employees "who will exercise reasonable care for their own safety, as well as for the safety of others, in the performance of their work."  <u>Arista Cia. deVapores, S. A. v. Howard Terminal</u>, 372 F.2d 152, 154 (9th Cir 1967).  That is,

> [w]hen an individual [employee] fails to exercise reasonable care for his own safety while on the job, his negligence is a breach of the [contractor's]  warranty of workmanlike service.  Even if the [employee's] negligence injures only himself, if those injuries lead to a lawsuit against the shipowner based upon the alleged unseaworthiness of shipowner's vessel, the [contractor] must indemnify the shipowner for any damages assessed.

<u>Id.</u>

---

[49]  In a letter from Ingram dated January 24, 2003, James Guttman, president of Mon River, was asked to "confirm that pursuant to our Master Towing Agreement, your Certificates of Insurance, and applicable law, Mon River Towing, Inc., and its relevant insurers will fully insure, defend, save harmless and indemnify Ingram Barge Company, Ingram Ohio Barge Co. and their affiliated companies from and against any and all claims, losses, liabilities, suits, costs, and other expenses which may arise out of this incident."  (Ingram Exhibit RR; *see also* Guttman Deposition at 60-66.)  While there may then be a contractual basis for indemnification, Ingram bases its arguments only on <u>Ryan</u> principles and therefore the Court will not address the contract issue.

Here, Smith failed to exercise reasonable care for his own safety by stepping into the bight of the line, an action against which he was warned in his formal training as a deckhand and an error of which he was aware by his own experience and admission.

The third element concerns the resulting exposure of Ingram to liability, regardless of fault. When Mon River filed its suit for limitation of liability, the recitation of facts noted that Ingram was the owner of the Barge 4833 on which Smith was standing when the accident occurred.  (Doc. No. 1, ¶¶ 13-14.)  Ingram subsequently filed its own limitation of liability action, seeking to limit the amount of its liability to the value of the barge.  Smith filed as a claimant in the Ingram action, alleging that the accident occurred as the result of the negligence and/or unseaworthiness of the barge.  Mon River also filed a claim in the Ingram action, "under the general maritime law and/or other applicable law and/or written contract, to defense, indemnity, contribution, attorney's fees, defense costs, reimbursement of maintenance and cure, costs of court, and pre- and post-judgment interest from and against Ingram Barge Company and/or its affiliates." (CA No. 03-180, Doc. No. 14, ¶ 8.)  Thus, the third element of the <u>Fairmont Ship</u> test is satisfied, i.e., Ingram (the ship owner) was exposed to liability regardless of fault. Contrary to the argument raised by Mon River and Smith in their memorandum in opposition to Ingram's objections, the Court finds the Special Master correctly concluded that Ingram has a valid indemnity claim against Mon River.

However, as noted above, the Special Master found that Barge 4833 was at all times seaworthy, i.e., the rigging on the deck of the barge was not a proximate or legal cause of Smith's accident (Conclusions of Law 10-12), nor was any of the negligent acts or conditions which Smith attributed to Ingram the proximate cause of his injuries (Conclusion of Law 16.)   Consequently, Ingram was also found not liable to Mon River for indemnification for the maintenance and cure paid to Smith.  (Conclusion of Law 17.)  Therefore, the Court is confronted with a situation in which Ingram incurred no liability for damages to Smith or Mon River but did incur the expense of defending against those claims for a period of more than three years.

The Court agrees with Ingram that under controlling Third Circuit law, there is no threshold requirement that a party be found liable to the claimant before the right to indemnification for attorneys' fees, costs and expenses of litigation is triggered.  In Ellerman Lines, Ltd. v. Atlantic & Gulf Stevedores, Inc., 339 F.2d 673 (3d Cir. 1964), *cert. denied*, 382 U.S. 812 (1965), Eckles, an injured longshoreman employed by Atlantic & Gulf, filed a civil suit against Ellerman.  Ellerman then filed an admiralty action seeking indemnification from Atlantic & Gulf "for all sums which it has been compelled to pay and to incur and for such additional sums as it may be required to pay hereafter in connection with" Eckles' suit.  Ellerman, 339 F. 2d. at 673 (internal quotation omitted).  The district court dismissed the admiralty case, holding  it was premature because such a suit could not be instituted and maintained until Eckles recovered from Ellerman under circumstances which provided a legal basis for recovery over against Atlantic & Gulf.  Ellerman, 224 F. Supp. 336, 338 (E. D. Pa. 1963); *see also* 339 F.2d at 673.  The court reasoned that if Atlantic & Gulf were eventually found in Eckles' suit to have breached its implied duty of workmanlike performance to Ellerman, the latter would be indemnified for its costs and reasonable counsel fees under Ryan, but until that breach of duty and right to indemnification were shown, Ellerman did not have a claim.  Ellerman, 224 F. Supp. at 338.  The district court also noted,  "The law does not permit a defendant who is unjustly sued to recover legal expenses incurred in defending the claim. There is no assurance that the employee will secure a recovery against the shipowner. If no such recovery is made by the employee, it is most unlikely that [Ellerman] would have any claim against [Atlantic & Gulf]."  Id., 224 F. Supp. at 338, n. 13.

The Court of Appeals disagreed, explicitly holding that

> If [the] conduct of Atlantic & Gulf in violation of its warranty to Ellerman was the sole responsible cause of Eckles' injury, as the libel alleges, the expense to which Ellerman is subjected in defending Eckles' suit against it to recover for that injury is an element of damage caused by the respondent's breach of warranty, *even if Ellerman succeeds in defeating Eckles' claim.*

Ellerman, 339 F. 2d at 674 (emphasis added).

61

This exception to the general American rule that the parties should bear their own costs, including attorneys' fees, has been consistently applied in this Circuit as well as others.  *See*, e.g., Gilchrist v. Mitsui Sempaku K. K., 405 F.2d 763, 769 (3d Cir. 1968), *cert. denied*, 394 U.S.920 (1969); Humble Oil & Refining Co. v. Philadelphia Ship Maintenance Co., 444 F.2d 727, 737, n. 19 (3d Cir. 1971); Miller v. A/B Svenska Amerika Linien, 454 F.2d 1094, 1096 (3d Cir. 1971);  Burris v. Global Bulk Carriers, Inc., 505 F.2d 1173, 1175 (3d Cir. 1974); Cooper, *supra*, at 1051-1052; SPM Corp. v. M/V *Ming Moon*, 22 F.3d 523, 525-526 (3d Cir. 1994); Massa v. C.A. Venezuelan Navigacion, 332 F.2d 779, 782 (2d Cir.), *cert. denied*, 379 U.S. 914 (1964); Guarracino v. Luckenbach S.S. Co., 333 F.2d 646, 648 (2d Cir. 1964);  Saks Int'l, Inc. v. M/V *Export Champion*, 817 F.2d 1011, 1014  (2d Cir. 1987); SCAC Transport (USA) Inc. v. S.S. *Danaos*, 845 F.2d 1157, 1164-1165 (2d Cir. 1988); Strachan Shipping Co. v. Koninklyke Nederlandsche S. M., 324 F.2d 746, 746-747 (5th Cir. 1963), *cert. denied*, 376 U.S. 954 (1964); Noritake Co. v. M/V *Hellenic Champion*, 627 F.2d 724, 731 (5th Cir. 1980);  Arista Cia. deVapores, 372 F.2d at 154.  As one court has pointed out, in these cases, the negligence of the contractor "rendered the shipowner liable to suit, and the Court sees no good reason for forcing the shipowner to bear the expenses of successfully defending the suit when the [contractor] would have to bear the shipowner's expenses of unsuccessfully defending the suit.  Such a rule would place a premium on losing lawsuits."  Massa, 332 F.2d at 782.  Thus, contrary to the conclusion of the Special Master, the Court finds that Ingram is entitled to indemnification for its attorneys' fees, expenses and costs of litigation in defending against the claims brought by Smith and Mon River.  However, as clearly pointed out in Cooper, Ingram may not recover the costs of prosecuting the indemnity claim itself. Cooper, 923 F.2d at 1051, n.7.

The Special Master further concluded, relying on Tebbs v. Baker-Whitley Towing Co., 407 F.2d 1055, 1059 (4th Cir. 1969) which quoted language from H&H Ship Service Co. v. Weyerhaeuser Line, 382 F.2d 711, 713 (9th Cir. 1967), that because Mon River had no control over

Smith's right to assert claims against Ingram, Ingram was not entitled to indemnification.  (*See* Conclusion of Law 26.)  The Court also agrees with Ingram that this is a misinterpretation of the law regarding the contractor's "control."

In H&H Ship Service, a painting and repair contractor's employee fell into a tank after he agreed to accompany a Weyerhaeuser employee into the dark hold of a ship without adequate light.  The court found that "the circumstances . . . relating to control, supervision, and expertise" and the fact that H&H Ship Service was better situated than Weyerhaeuser to take steps to avoid the accident (for instance, by waiting a few moments for an additional light to be provided) were sufficient to imply a warranty of workmanlike service on the part of the contractor.  Id. at 713. Therefore, Weyerhaeuser was entitled to seek indemnification from the contractor for liability incurred as a result of the breach of this warranty.  It is clear from the context that the element of "control" applies to that which the employer has in determining how the employee performs his duties, i.e., assuring that the necessary steps are taken to avoid accidents, not to that which the employer may or may not have over the employee's decision to file suit against the shipowner.[50]

As discussed at length above, Mon River, through the expertise of Kurowsky and the crew of the *Rose G.*, had complete control and supervision of moving Ingram's barges, including the maneuvers which resulted in Smith's injuries. Moreover, there is no evidence from which to infer that Ingram took any action (or failed to taken any action) which "prevented or seriously impeded" Mon River's ability to perform in a workmanlike manner, in which case Ingram would be precluded from seeking indemnification.  Cooper, 923 F.2d at 382 F.2d at 1050-1051.

The Court will therefore sustain Ingram's objections to the Special Master's Conclusions of Law 19 through 27, and will set forth a procedure for determining the appropriate amount of

---

[50]  As Ingram points out (Ingram Memo at 10), even if the Special Master were correct in his interpretation of the "control" element, it would not apply to Mon River's own claim for indemnification over which it had complete control.

attorneys' fees, expenses, and costs of litigation owed to Ingram in defending against the claims brought by Smith and Mon River, as explained more fully in the Order which accompanies this Memorandum Opinion.

## VII.    OTHER MATTERS

Despite the Court's Order that all pre-hearing motions were to be submitted to the Special Master and not filed with the Court, the parties filed a number of such motions.  The Court has reviewed the motions *in limine* filed at docket numbers 141, 143, 145, 147, 149, 152, 154, a Motion to Strike at docket number 175, and a Motion to Offer and Admit Exhibit YY at docket number 196, together with the Special Master's rulings on those motions filed at docket number 158 and during the course of the hearing.  The motions are denied as moot, having been thoroughly addressed by the Special Master.

An appropriate Order follows.

s/Arthur J. Schwab
Arthur J. Schwab
United States District Judge

Dated:  February 28, 2007

cc:    Meredith L. Lawrence, Esq.
       Meredith L. Lawrence, P.S.C.
       301 Second Street
       P.O. Box 1330
       Warsaw, KY  41095
       Email: larry@lawrencelaws.com

       Justin Lawrence, Esq.
       Justin L. Lawrence, P.S.C.
       107 East High Street
       P.O.  Box 1330
       Warsaw, KY 41095
       Email: justin@lawrencelaws.com

Leonard Fornella, Esq.
Kenneth F. Klanica, Esq.
Heintzman, Warren, Wise & Fornella, PC
The Gulf Tower, 35th Floor
707 Grant Street
Pittsburgh, PA  15219
Email: kklanica@hwwlaw.com
Email: fornella@hwwlaw.com

Dennis A. Watson, Esq.
Holly M. Whalen, Esq.
Michael K. Feeney, Esq.
Grogan Graffam, P.C.
Four Gateway Center, 12th Floor
Pittsburgh, PA 15222-1009
Email: GGPCdocketing@grogangraffam.com

Special Master Mark D. Shepard, Esq.
Babst, Calland, Clements & Zomnir
Two Gateway Center
8th Floor
Pittsburgh, PA 15222
Email: mshepard@bccz.com